Gertrude THOMAS, Plaintiff–Appellant,

v.

**Louis W. SULLIVAN, Secretary of Health and Human Services, Defendant–Appellee.**

**No. 18, Docket 89–6166.**

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1990.

Decided Dec. 27, 1990.

Ian Feldman, Bronx, N.Y. (Marshall Green, Bronx, N.Y., Kalman Finkel, New York City, The Legal Aid Soc., on the brief), for plaintiff-appellant.

Kathleen A. Zebrowski, Sp. Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty., S.D. N.Y., Marla Alhadeff, Asst. U.S. Atty., New York City, on the brief), for defendant-appellee.

Before FEINBERG, VAN GRAAFEILAND, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Gertrude Thomas appeals from a final judgment of the United States District Court for the Southern District of New York, Leonard B. Sand, *Judge*, dismissing her complaint for review of a decision of the Secretary of Health and Human Services ("Secretary"), which denied her application for widow's insurance benefits ("widow's benefits") under § 216(h)(1)(B) of the Social Security Act (the "Act"), 42 U.S.C. § 416(h)(1)(B) (1988), on the ground that her marriage was invalid and she had not gone through a marriage ceremony. The complaint contended that the distinction drawn in § 416(h)(1)(B) between invalid ceremonial and invalid common-law marriages violates the equal protection component of the Due Process Clause of the Fifth Amendment. The district court dismissed the complaint on the ground that the distinction drawn in § 416(h)(1)(B) has a rational basis. On appeal, plaintiff pursues her constitutional challenge. For the reasons below, we affirm the judgment.

## I. BACKGROUND

Gertrude Thomas ("Gertrude") lived with Joseph Thomas ("Joseph") for 47 years, from 1938 until his death in 1985, and they had 10 children together. They lived together in Atlanta, Georgia, for many years until they moved to New York. Georgia law recognizes common-law marriages; though New York law does not, it gives full faith and credit to such marriages that are valid under the laws of other states.

In October 1978, Gertrude applied for wife's insurance benefits ("wife's benefits") under § 202(b) of the Act, 42 U.S.C. § 402(b) (1988), stating that she and Joseph had married on January 25, 1943. In support of that application, Joseph submitted a signed statement to the Social Security Administration ("SSA"), identifying Gertrude as his wife, certifying that they had been married by a "[c]lergyman or authorized public official," and stating that his previ-

ous marriage to one "Janie Mills" had ended with Janie's death in 1940. Thereafter, Gertrude received wife's benefits; these were converted to widow's benefits when Joseph died in May 1985.

In July 1985, a woman identifying herself as Janie Thomas ("Janie") applied for benefits as the widow of Joseph Thomas. In support of her application she submitted a marriage certificate showing that she and Joseph had married in September 1918. Janie stated in her application that although she and Joseph had separated in 1933, they had never been divorced and she had never been notified of any attempt by Joseph to obtain a divorce. SSA notified Gertrude that her widow's benefits might be terminated as a result of Janie's claim and gave her an opportunity to present evidence to prove her own entitlement.

A search by SSA turned up no record of a divorce in any of the places where Joseph or Janie had lived since 1933. As a result, SSA determined that Janie was Joseph's lawful widow and that Gertrude's marriage to Joseph was not valid. It notified Gertrude that she would no longer receive widow's benefits. Gertrude promptly requested reconsideration, contending that she was entitled to those benefits, having been told by Joseph that he was divorced and having gone through a marriage ceremony with him. In support of her request for reconsideration, she submitted a statement that in October 1942 she had obtained a marriage license in Decatur, Georgia, and that, shortly thereafter, she and Joseph had been married by a minister in Atlanta. She also stated, "[m]y husband had told me that he was previously married and divorced. But, he never gave me any details about the first marriage." Gertrude submitted a second statement in which she described having met Joseph's first wife:

In fact, when Mr. Thomas and I first married, we lived together in Atlanta, Ga. with his mother, his first wife Janie Thomas would come to the house to visit Joseph's mother and she knew Joseph and I married [*sic*]. She never once expressed the fact that she and Joseph never divorced. I never discussed with

Joseph where the divorce was taken out or who took out the divorce. He never wanted to discuss anything about his first marriage.

In a March 1986 "Reconsideration Determination," SSA indicated that it had searched the marriage records of Decatur and had found no record of a marriage of Gertrude and Joseph, and that it had separately searched for any record of issuance to them of a marriage license, also without success. As a result, SSA concluded that "[s]ince Gertrude Thomas was not validly married to Mr. Thomas," and since "no evidence of a ceremonial marriage has been submitted or located," Gertrude was not eligible for widow's benefits.

Gertrude timely requested and received a hearing before an Administrative Law Judge ("ALJ"). At the hearing, she testified that she had obtained a marriage license and she and Joseph had been married by a minister in 1938. She said the only witnesses to the wedding had been members of the minister's family, whom she did not know. Her own family was informed of the wedding a few days thereafter; none of the family was still alive at the time of the hearing. Gertrude testified that after the ceremony, the minister "told us that he was going to mail the license in so it could be recorded, and mail us our marriage certificate, which he never did." She explained that her failure to verify that the marriage had been recorded was a result of her youthful trust in Joseph:

> [Gertrude]: I didn't follow up as I should have, because I was quite young at the time and I just took what he said to be true, and at the time I was 21 and he was 45, so I can see now where I could have been very much easy to lead, to be led by what he said and I was in love with him and I just accepted what he told me, thinking everything was okay.
>
> ALJ: It happens when you are in love.
>
> [Gertrude]: Oh, yes Sir. But I can see my mistake now. It's just too late.

After giving Gertrude more time to attempt to produce additional evidence, the ALJ found that because Joseph had remained married to Janie until his death, he "was under a legal impediment preventing him from entering into a valid marriage with Gertrude" and that Gertrude "has not supplied any evidence of a ceremonial marriage with Joseph Thomas and therefore cannot be considered as a deemed widow" within the meaning of § 416(h)(1)(B). ALJ Decision dated September 20, 1986.

Gertrude timely sought review of the ALJ's decision by the SSA Appeals Council. While conceding that she was "unable to prove her assertion that she and the wage earner were ceremonially married," she contended that the Secretary's refusal to grant benefits to her in light of her good-faith belief in the validity of her common-law marriage violated her right to equal protection. Gertrude's request for review was denied, and she brought the present action for review of that denial.

The district court, in an opinion published at 713 F.Supp. 114 (1989), rejected Gertrude's constitutional challenge to § 416(h)(1)(B), finding that there was a rational basis for the statute's distinction between invalid ceremonial marriages and invalid common-law marriages. Noting that the legislative history of § 416(h)(1)(B) was sparse, the court found principally that Congress might well have considered claims based on invalid marriages to be "inherently suspect," and that it could rationally have decided to exclude such claims as it believed could more easily be falsified:

> The issue, like that in [*Weinberger v.*] *Salfi*, [422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975),] is whether the distinction made by § 416(h)(1)(B)—though less than perfectly tailored to the problem—is based on a rational fear that there is a greater possibility of false claims related to invalid common law marriages as opposed to invalid ceremonial marriages. We think it is.
>
> In the first place, it is easier for a claimant to fake a common law marriage than a ceremonial one. Put another way and seen from the perspective of the Social Security Administration, it is easier to detect a false claim of a ceremonial marriage than a common law marriage.

A ceremonial marriage requires documentary proof, such as a marriage license, an official and witnesses to the ceremony, that cannot be faked after the death of one of the parties. Thus, Congress reasonably might have considered an invalid ceremonial marriage to have some indicia of reliability that are not present in invalid common law marriages. Because a common law marriage—and in particular one that is not even valid—does not have the same level of formality, it can be faked more easily.

713 F.Supp. at 118.

Accordingly, the district court upheld the denial of benefits and dismissed the complaint. Gertrude has appealed, pursuing her contention that § 416(h)(1)(B), insofar as it grants rights to invalidly married persons who in good faith went through marriage ceremonies but denies rights to invalidly married persons who in good faith believed that they were married under common law, violates the equal protection component of the Due Process Clause.

## II. DISCUSSION

Section 216(h)(1)(A) of the Act provides that for purposes of deciding an application for, *inter alia,* widow's benefits, the Secretary will recognize as valid a marriage that would be recognized as valid by the courts of the state in which the wage earner was domiciled. 42 U.S.C. § 416(h)(1)(A). Where there is no valid marriage, § 216(h)(1)(B) of the Act requires the Secretary to "deem[ ]" the applicant for benefits to be a widow in certain cases where she has in good faith gone through a marriage ceremony. The latter section (the "deeming rule") provides, in pertinent part, as follows:

> [i]n any case where ... an applicant is not the ... widow of a[n] ... insured individual, ... but it is established to the satisfaction of the Secretary that such applicant in good faith went through a marriage ceremony with such individual resulting in a purported marriage between them which, but for a legal impediment not known to the applicant at the time of such ceremony, would have been

a valid marriage, and such applicant and the insured individual were living in the same household at the time of the death of such insured individual[,] ... such purported marriage shall be deemed to be a valid marriage.... For purposes of this subparagraph, a legal impediment to the validity of a purported marriage includes only an impediment (i) resulting from the lack of dissolution of a previous marriage, or (ii) resulting from a defect in the procedure followed in connection with such purported marriage.

42 U.S.C. § 416(h)(1)(B). For the reasons below, we conclude that this provision does not violate principles of equal protection.

■ There is no fundamental right to the receipt of benefits from the government. *See generally Dandridge v. Williams,* 397 U.S. 471, 485–86, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970). In deciding an equal protection challenge to a statute that classifies persons for the purpose of receiving such benefits, we are required, so long as the classifications are not suspect or quasi-suspect and do not infringe fundamental constitutional rights, to uphold the legislation if it bears a rational relationship to a legitimate governmental objective. *See Weinberger v. Salfi,* 422 U.S. 749, 769–70, 95 S.Ct. 2457, 2469, 45 L.Ed.2d 522 (1975); *Schweiker v. Wilson,* 450 U.S. 221, 234–35, 101 S.Ct. 1074, 1082–83, 67 L.Ed.2d 186 (1981). In seeking to determine whether there are such a relationship and objective, we consider not only contemporaneous articulations of legislative purpose but also any legitimate policy concerns on which the legislature might conceivably have relied. *See, e.g., Exxon Corp. v. Eagerton,* 462 U.S. 176, 196, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981). We will uphold the legislation if we can ascertain that the classifications Congress has created can be explained on the basis of factors relevant to the administration and purposes of the particular benefit program, and are not "merely an unthinking response to stereotyped generalizations" about the excluded group. *Califano v. Jobst,* 434 U.S. 47, 54, 98 S.Ct. 95, 99, 54 L.Ed.2d 228 (1977). "As long as

the classificatory scheme chosen by Congress rationally advances a reasonable and identifiable governmental objective, we must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred." *Schweiker v. Wilson,* 450 U.S. at 235, 101 S.Ct. at 1083.

■ . Where the legislation grants rights to a segment of a class that as a whole had theretofore been denied benefits, our assessment of the rationality of Congress's scheme should be even more generous. In lifting a barrier to benefits, Congress should not be "required to take an all-or-nothing approach," but should be allowed to "proceed more cautiously" where "[i]t had valid reasons for doing so." *Bowen v. Owens,* 476 U.S. 340, 347, 106 S.Ct. 1881, 1886, 90 L.Ed.2d 316 (1986); *see also id.* at 348, 106 S.Ct. at 1886 ("A constitutional rule that would invalidate Congress' attempts to proceed cautiously in awarding increased benefits [under the Act] might deter Congress from making any increases at all."); *Mathews v. De Castro,* 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976); *Califano v. Jobst,* 434 U.S. at 57–58, 98 S.Ct. at 101. Congress is generally entitled to adopt prophylactic rules as a means of reducing the possibility of fraudulent claims upon the public treasury. Though the lines drawn may not perfectly exclude all abusers and include all nonabusers, they are to be upheld if Congress could rationally have concluded (a) that the general classification would provide some protection against abuse, and (b) that the expense and other difficulties of making individual determinations justified the inherent imprecision of the exclusion of a group:

the question raised is not whether a statutory provision precisely filters out those and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions.... Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule.

*Weinberger v. Salfi,* 422 U.S. at 777, 95 S.Ct. at 2472–73.

■ In analyzing § 416(h)(1)(B) in the present case, we are aided little by the legislative history. Prior to 1957, social security benefits to spouses were awarded in accordance with state laws of succession. *See* 42 U.S.C. § 416(h)(1) (1952). In 1957, Congress enacted § 416(h)(1)(A), which premised rights to such benefits on state laws with respect to marriage. Pub.L. 85–238, § 3(h)(1), 71 Stat. 518, 519 (1957). Thus, until 1960, widow's benefits were available only to applicants whose marriages to the wage earner were valid. Section 416(h)(1)(B) was added in 1960 because Congress recognized that it is sometimes difficult for an individual to determine, *inter alia,* whether or when a prior marriage has been validly ended. *See* S.Rep. No. 1856, 86th Cong., 2d Sess. 22, *reprinted in* 1960 U.S.Code Cong. & Admin.News 3608, 3629 ("[s]ince the State laws governing marriage and divorce are sometimes complex and subject to differing interpretations, a person may believe that he is validly married when he is not"). Though those who aspire to a common-law marriage may find it equally difficult to determine whether a prior marriage has been validly ended, the legislative history is silent as to why Congress excluded such aspirants from those who should be "deemed" valid widows. *See id.; see also* H.R.Rep. No. 1799, 86th Cong., 2d Sess. 16 (1960).

Congress may have modeled § 416(h)(1)(B) after the civil-law doctrine of "putative marriages." Under this doctrine, some states recognize an invalid marriage as valid when one or both parties have a good faith belief in the validity of a marriage and were ignorant of the legal impediment that makes the marriage invalid. *See generally* H. Clark, *The Law of Domestic Relations* § 2.4, at 55–56 (2d ed.

1988). Traditionally, this recognition was not given unless the participants had gone through a ceremonial marriage, a requirement imposed to demand proof of their good faith, albeit mistaken, belief in the validity of their marriage. *See, e.g., Smith v. Smith*, 1 Tex. 621, 628–29 (1846) (ceremony prerequisite to the granting of relief to a putative spouse is relevant to applicant's good faith); Comment, *The Requisite of a Marriage Ceremony for Putative Relationships*, 4 Baylor L.Rev. 343, 346 (1952). In more recent years, some states have extended the putative-marriage doctrine to recognize common-law marriages. *See, e.g., Hupp v. Hupp*, 235 S.W.2d 753 (Tex.Civ.App.1950); Minn.Stat. § 518.055.

Though Congress gave no explanation in the legislative history for its decision to limit the deeming rule of § 416(h)(1)(B) to applicants who have gone through ceremonial marriages, it is inferable that the decision to continue to deny benefits to invalidly married persons who had not gone through such ceremonies had two purposes. First, Congress may have sought a means of reducing the incidence of fraudulent claims. In these modern times, many couples, with or without uncertainty as to the dissolution of a prior marriage, decide to cohabit without marrying. Congress may have envisioned the possibility that an unlimited deeming provision would invite fraudulent claims from such persons. Further, Congress may have adopted the more traditional view that a willingness to go through a formal marriage ceremony constitutes some objective evidence of a good-faith belief in the dissolution of any prior marriages. It could rationally have believed that persons who have doubts about whether a prior marriage has been validly ended will be more reluctant to go through a marriage ceremony than they will to enter into an informal cohabitational relationship, perhaps from fear of public criticism, or from fear of having word get back to the prior spouse, or from fear of violating laws against bigamy.

Second, since § 416(h)(1)(B) requires the applicant to show that but for the unknown impediment there would have been a valid marriage, Congress may have sought to establish a criterion that is entirely objective and normally susceptible to documentary proof in order to limit the administrative cost of determining whether that prerequisite is met. If the deeming rule had been made applicable to invalid common-law marriages, the applicant would have to show that all of the prerequisites to common-law marriage were met. Traditionally, the two fundamental requirements for a common-law marriage imposed by the states that have recognized such marriages were (1) the parties' express agreement to be husband and wife, and (2) their holding themselves out to the world as married. *See* H. Clark, *The Law of Domestic Relations* § 2.4, at 48. The first requirement has been eroded somewhat by rulings that have allowed the existence of the required agreement to be inferred from the fact that the couple has lived together "for all intents and purposes" as husband and wife. *Id.* § 2.4, at 49 & n. 31. Whichever test is applied, however, the focus is on the parties' intent. Thus, establishment of a purported common-law marriage would generally require proof of an element that is ultimately subjective.

A ceremonial marriage, on the other hand, is an objectively observable event occurring at a defined place and time. Proof of such a marriage will normally be available through documentary evidence such as the original marriage certificate, a certified copy of a public record of marriage, or a certified copy of a church or synagogue record of marriage. *See generally* SSA Program Operations Manual System ("Manual") § 00305.075. Such documentary evidence is normally accepted by the Secretary as conclusive proof that there was a marriage ceremony. By extending benefits only to those invalidly married persons who can prove that they went through such a ceremony, Congress has made it possible for the Secretary to make a determination in part on the basis of one objective, rather than subjective, criterion, and on the basis of documentary, rather than testimonial, proof.

To be sure, the marriage ceremony requirement in the deeming rule does not relieve the Secretary of all need to assess subjective factors or testimonial evidence. First, there is the statutory requirement

that any applicant demonstrate to the Secretary's satisfaction that she went through the marriage ceremony "in good faith." This element, of course, requires a subjective assessment:

In determining whether the claimant acted in good faith, the test is the individual claimant's belief at the time of the ceremony.... The fact that another person might not have had the same belief under the same circumstances ... will not preclude a finding that the claimant acted in good faith.... [F]actors which may be helpful in doubtful cases in resolving the question (i.e. whether the claimant's allegation of believing the marriage valid is credible) are the claimant's education, experience in worldly affairs, and age.

Manual § 00305.180. Thus, even where there has been a ceremonial marriage, there remains at least one subjective component to be dealt with by the Secretary.

Further, under the Secretary's procedures, the marriage ceremony itself may be proven by secondary evidence where "primary proof" of a marriage by a certificate or official record is not available. Such secondary proof might consist of the testimony of witnesses who attended the ceremony. Where the claimant relies on secondary evidence, the Secretary will not deem that evidence conclusive but will conduct further inquiry. *See* Manual § 00305.090 ("[S]econdary proof of marriage ... cannot be treated as conclusive but must be considered in the light of other information in the file.... This is particularly significant in claims involving a deemed marriage.") Thus, in some cases even the marriage-ceremony requirement will not spare the Secretary the burden of taking testimony on all of the elements of the applicant's claim.

Nonetheless, in most instances, the ceremonial marriage requirement does lessen the Secretary's administrative burden by eliminating the need to receive and assess testimonial evidence on one element, and it is therefore rationally related to the goal of reducing administrative costs. In these circumstances, the fact that the line drawn does not lessen the burden in all instances is unimportant.

In sum, though the result of the deeming rule structured by Congress may seem harsh in the present case, we conclude that it is rationally related to legitimate governmental objectives and may not be overturned.

## CONCLUSION

For the foregoing reasons, we affirm the judgment dismissing the complaint.

VAN GRAAFEILAND, Circuit Judge, concurring:

I concur in this case with great reluctance and wish that I could do otherwise. It seems unconscionable to me that this seventy-four year old widow who lived with Joseph Thomas for forty-seven years and bore ten of his children is now to be branded an adulteress, with whatever ramifications to her and her children that may result from this adjudication. *See Grey v. Heckler,* 721 F.2d 41, 49 (2d Cir.1983) (Van Graafeiland, J., dissenting). However, we must apply the law as Congress wrote it, not as we would like to have had it written.