DENNIS JACOBS, Chief Judge:
Plaintiff Edith Windsor sued as surviving spouse of a same-sex couple that was married in Canada in 2007 and was resident in New York at the time of her spouse’s death in 2009. Windsor was denied the benefit of the spousal deduction for federal estate taxes under 26 U.S.C. § 2056(A) solely because Section 3 of the Defense of Marriage Act (“DOMA”), 1 U.S.C. § 7, defines the words “marriage” and “spouse” in federal law in a way that bars the Internal Revenue Service from recognizing Windsor as a spouse or the couple as married. The text of § 3 is as follows:
In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word “marriage” *176 means only a legal union between one man and one woman as husband and wife, the word “spouse” refers only to a person of the opposite sex who is a husband or a wife.
1 U.S.C. § 7. At issue is Windsor’s claim for a refund in the amount of $363,053, which turns on the constitutionality of that section of federal law.
For the reasons that follow we hold that:
I. Windsor has standing in this action because we predict that New York, which did not permit same-sex marriage to be licensed until 2011, would nevertheless have recognized Windsor and Thea Clara Spyer as married at the time of Spyer’s death in 2009, so that Windsor was a surviving spouse under New York law.
II. Windsor’s suit is not foreclosed by Baker v. Nelson, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972), which held that the use of the traditional definition of marriage for a state’s own regulation of marriage status did not violate equal protection.
III. Section 3 of DOMA is subject to intermediate scrutiny under the factors enumerated in City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), and other cases.
IV. The statute does not withstand that review.
On June 6, 2012, the United States District Court for the Southern District of New York (Jones, J.) granted summary judgment in favor of Windsor in a thorough opinion. Windsor v. United States, 833 F.Supp.2d 394 (S.D.N.Y.2012). The court ruled that Section 3 of DOMA violated the equal protection because there was no rational basis to support it. Id. at 406. “We review a district court’s grant of summary judgment de novo, construing the record in the light most favorable to the nonmoving party.” Church of American Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 203 (2d Cir.2004).
A preliminary issue concerning alignment of the parties on appeal has been presented by motion. The United States, initially named as the sole defendant, conducted its defense of the statute in the district court up to a point. On February 23, 2011, three months after suit was filed, the Department of Justice declined to defend the Act thereafter, and members of Congress took steps to support it. The Bipartisan Legal Advisory Group of the United States House of Representatives (“BLAG”) retained counsel and since then has taken the laboring oar in defense of the statute. The United States remained active as a party, switching sides to advocate that the statute be ruled unconstitutional.
Following the district court’s decision, BLAG filed a notice of appeal, as did the United States in its role as nominal defendant. BLAG moved this Court at the outset to strike the notice of appeal filed by the United States and to realign the appellate parties to reflect that the United States prevailed in the result it advocated in the district court. The motion is denied. Notwithstanding the withdrawal of its advocacy, the United States continues to enforce Section 3 of DOMA, which is indeed why Windsor does not have her money. The constitutionality of the statute will have a considerable impact on many operations of the United States. See INS v. Chadha, 462 U.S. 919, 931, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (“When an agency of the United States is a party to a case in which the Act of Congress it administers is held unconstitutional, it is an aggrieved party for purposes of taking an appeal.... The agency’s status as an aggrieved party ... is not altered by the *177 fact that the Executive may agree with the holding that the statute in question is unconstitutional.”).
DISCUSSION
I
For the purpose of federal estate taxes, the law of the state of domicile ordinarily determines whether two persons were married at the time of death. Eccles v. Comm’r., 19 T.C. 1049, 1051, 1053-54 (1953); Rev. Rul. 58-66, 1958-1 C.B. 60 (“The marital status of individuals as determined under state law is recognized in the administration of the Federal income tax laws.”). At the time of Spyer’s death in 2009, New York did not yet license same-sex marriage itself. A separate question — decisive for standing in this case — is whether in 2009 New York recognized same-sex marriages entered into in other jurisdictions. That question was presented to the New York Court of Appeals in Godfrey v. Spano, 13 N.Y.3d 358, 892 N.Y.S.2d 272, 920 N.E.2d 328 (2009). However, the court was able to resolve that case on other grounds, finding “it unnecessary to reach defendants’ argument that New York’s common-law marriage recognition rule is a proper basis for the challenged recognition of out-of-state same-sex marriages.” Id. at 377, 892 N.Y.S.2d 272, 920 N.E.2d 328.
When we are faced with a question of New York law that is decisive but unsettled, we may “predict” what the state’s law is, consulting any rulings of its intermediate appellate courts and trial courts, or we may certify the question to the New York Court of Appeals. See State Farm Mut. Auto. Ins. Co. v. Mallela, 372 F.3d 500, 505 (2d Cir.2004). BLAG urges that we certify this question, observing that this is an option that we have and that the district court did not. We decline to certify.
First, the Court of Appeals has signaled its disinclination to decide this very question. When it elected to decide Godfrey on an alternative sufficient ground, the Court of Appeals expressed a preference and expectation that the issue would be decided by the New York legislature: “[w]e ... hope that the Legislature will address this controversy.” Godfrey, 13 N.Y.3d at 377, 892 N.Y.S.2d 272, 920 N.E.2d 328. We hesitate to serve up to the Court of Appeals a question that it is reluctant to answer for a prudential reason.
Second, rulings of New York’s intermediate appellate courts are useful and unanimous on this issue. It is a “well-established principle that the ruling of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.” Statharos v. New York City Taxi and Limousine Comm’n., 198 F.3d 317, 321 (2d Cir.1999) (internal quotation marks and ellipsis omitted). Three of New York’s four appellate divisions have concluded that New York recognized foreign same-sex marriages before the state passed its marriage statute in 2011. See In re Estate of Ranftle, 81 A.D.3d 566, 917 N.Y.S.2d 195 (1st Dep’t 2011) (Windsor’s home Department, recognizing a 2008 Canadian marriage); Lewis v. N.Y. State Dep’t. of Civil Serv., 60 A.D.3d 216, 872 N.Y.S.2d 578 (3rd Dep’t 2009), aff'd on other grounds sub nom., Godfrey, 13 N.Y.3d 358, 892 N.Y.S.2d 272, 920 N.E.2d 328; Martinez v. Cnty. of Monroe, 50 A.D.3d 189, 850 N.Y.S.2d 740 (4th Dep’t 2008). Two of these cases, Lewis and Martinez, were decided before Spyer died on February 5, 2009. Given the consistent view of these decisions, we see no need to *178 seek guidance here. Because Windsor’s marriage would have been recognized under New York law at the time of Spyer’s death, she has standing.
II
In Baker v. Nelson, an appeal from a Minnesota Supreme Court decision finding no right to same-sex marriage, the Supreme Court issued a summary dismissal “for want of a substantial federal question.” 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). The Minnesota Supreme Court had held that “[t]he equal protection clause of the Fourteenth Amendment, like the due process clause, is not offended by the state’s classification of persons authorized to marry.” Baker v. Nelson, 291 Minn. 310, 313, 191 N.W.2d 185 (Minn.1971). According to BLAG, Baker compels the inference that Congress may prohibit same-sex marriage in the same way under federal law without offending the Equal Protection Clause. We disagree.
“The Supreme Court has long recognized that the precedential value of a summary dismissal is limited to ‘the precise issues presented and necessarily decided by’ the dismissal.” Alexander v. Cahill, 598 F.3d 79, 89 n. 7 (2d Cir.2010) (quoting Mandel v. Bradley, 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977)). The question whether the federal government may constitutionally define marriage as it does in Section 3 of DOMA is sufficiently distinct from the question in Baker: whether same-sex marriage may be constitutionally restricted by the states. After all, Windsor and Spyer were actually married in this case, at least in the eye of New York, where they lived. Other courts have likewise concluded that Baker does not control equal protection review of DOMA for these reasons.[1]
Even if Baker might have had resonance for Windsor’s case in 1971, it does not today. “ ‘[I]nferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise.’ ” Hicks v. Miranda, 422 U.S. 332, 344, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975) (quoting Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth., 387 F.2d 259, 263 n. 3 (2d Cir.1967) (Friendly, J.)) (emphasis added). In the forty years after Baker, there have *179 been manifold changes to the Supreme Court’s equal protection jurisprudence.
When Baker was decided in 1971, “intermediate scrutiny” was not yet in the Court’s vernacular. See Craig v. Boren, 429 U.S. 190, 218, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (Rehnquist, J., dissenting) (coining “intermediate level scrutiny”). Classifications based on illegitimacy and sex were not yet deemed quasi-suspect. See Lalli v. Lalli 439 U.S. 259, 264-65, 275, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (applying intermediate scrutiny to a classification based on illegitimacy, and describing how heightened scrutiny had been used for such classifications starting in 1976); Frontiero v. Richardson, 411 U.S. 677, 682, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (plurality opinion) (identifying sex as a suspect class); Boren, 429 U.S. at 197-98, 97 S.Ct. 451 (applying intermediate scrutiny to a classification based on sex); United States v. Virginia, 518 U.S. 515, 575, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (Scalia, J., dissenting) (summarizing that sex-based classifications were analyzed with rational basis review before the 1970’s).[2] The Court had not yet ruled that “a classification of [homosexuals] undertaken for its own sake” actually lacked a rational basis. Romer v. Evans, 517 U.S. 620, 635, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). And, in 1971, the government could lawfully “demean [homosexuals’] existence or control their destiny by making their private sexual conduct a crime.” Lawrence v. Texas, 539 U.S. 558, 574, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (noting that there was a “tenable” equal protection argument against such laws, but choosing instead to overturn Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986)). These doctrinal changes constitute another reason why Baker does not foreclose our disposition of this case.
The First Circuit has suggested in dicta that recognition of a new suspect classification in this context would “imply[] an overruling of Baker.” See Massachusetts, 682 F.3d at 9. We disagree for two reasons that the First Circuit did not discuss. First, when it comes to marriage, legitimate regulatory interests of a state differ from those of the federal government. Regulation of marriage is “an area that has long been regarded as a virtually exclusive province of the States.” Sosna v. Iowa, 419 U.S. 393, 404, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). It has for very long been settled that “[t]he State ... has [the] absolute right to prescribe the conditions upon which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved.” Pennoyer v. Neff, 95 U.S. 714, 734-35, 24 L.Ed. 565 (1878), overruled on other grounds by Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Therefore, our heightened scrutiny analysis of DOMA’s marital classification under federal law is distinct from the analysis necessary to determine whether the marital classification of a state would survive such scrutiny.
Second, the Supreme Court’s decision to apply rational basis review in Romer does not imply to us a refusal to recognize homosexuals as a quasi-suspect class. See Massachusetts, 682 F.3d at 9. The litigants in Romer had abandoned their quasi-suspect argument after the trial court decision. See Romer, 517 U.S. at 640 n. 1, 116 S.Ct. 1620 (Scalia, J., dissenting). We are satisfied, for these reasons, that Baker has no bearing on this case.
*180 III
“In deciding an equal protection challenge to a statute that classifies persons for the purpose of receiving [federal] benefits, we are required, so long as the classifications are not suspect or quasi-suspect and do not infringe fundamental constitutional rights, =to uphold the legislation if it bears a rational relationship to a legitimate governmental objective.” Thomas v. Sullivan, 922 F.2d 132, 136 (2d Cir.1990). Of course, “ ‘a bare ... desire to harm a politically unpopular group cannot constitute a legitimate government interest.’ ” Romer v. Evans, 517 U.S. 620, 634-35, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (quoting Dep’t of Agric. v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)). So while rational basis review is indulgent and respectful, it is not meant to be “toothless.” Schweiker v. Wilson, 450 U.S. 221, 234, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) (quoting Mathews v. Lucas, 427 U.S. 495, 510, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)).
The district court ruled that DOMA violated the Equal Protection Clause for want of a rational basis. Windsor, 833 F.Supp.2d at 406. But the existence of a rational basis for Section 3 of DOMA is closely argued. BLAG and its amici proffer several justifications that alone or in tandem are said to constitute sufficient reason for the enactment. Among these reasons are protection of the fisc, uniform administration of federal law notwithstanding recognition of same-sex marriage in some states but not others, the protection of traditional marriage generally, and the encouragement of “responsible” procreation.
Windsor and her amici vigorously argue that DOMA is not rationally related to any of these goals. Rational basis review places the burden of persuasion on the party challenging a law, who must disprove “‘every conceivable basis which might support it.’ ” Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). So a party urging the absence of any rational basis takes up a heavy load. That would seem to bedrue in this case — the law was passed by overwhelming bipartisan majorities in both houses of Congress; it has varying impact on more than a thousand federal laws; and' the definition of marriage it affirms has been long-supported and encouraged.
On the other hand, several courts have read the Supreme Court’s recent cases in this area to suggest that rational basis review should be more demanding when there are “historic patterns of disadvantage suffered by the group adversely affected by the statute.” See Massachusetts, 682 F.3d at 10-11; Able v. U.S., 155 F.3d 628, 634 (2d Cir.1998); United States v. Then, 56 F.3d 464, 468 (2d Cir.1995) (Calabresi, J., concurring). Proceeding along those lines, the district court in this case and the First Circuit in Massachusetts both adopted more exacting rational basis review for DOMA. See Massachusetts, 682 F.3d at 11 (describing its “more careful assessment”); Windsor, 833 F.Supp.2d at 402 (noting that “rational basis analysis can vary by context”). At argument, counsel for BLAG wittily characterized this form of analysis as “rational basis plus or intermediate scrutiny minus.” Oral Arg. Tr. 16:10-12.
The Supreme Court has not expressly sanctioned such modulation in the level of rational basis review; discussion pro and con has largely been confined to concur *181 ring and dissenting opinions.[3] We think it is safe to say that there is some doctrinal instability in this area.
Fortunately, no permutation of rational basis review is needed if heightened scrutiny is available, as it is in this case. We therefore decline to join issue with the dissent, which explains why Section 3 of DOMA may withstand rational basis review.
Instead, we conclude that review of Section 3 of DOMA requires heightened scrutiny. The Supreme Court uses certain factors to decide whether a new classification qualifies as a quasi-suspect class. They include: A) whether the class has been historically “subjected to discrimination,” Bowen v. Gilliard, 483 U.S. 587, 602, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987); B) whether the class has a defining characteristic that “frequently bears [a] relation to ability to perform or contribute to society,” Cleburne, 473 U.S. at 440-41, 105 S.Ct. 3249; C) whether the class exhibits “obvious, immutable, or distinguishing characteristics that define them as a discrete group;” Bowen, 483 U.S. at 602, 107 S.Ct. 3008; and D) whether the class is “a minority or politically powerless.” Id. Immutability and lack of political power are not strictly necessary factors to identify a suspect class. See Cleburne, 473 U.S. at 442 n. 10, 105 S.Ct. 3249 (“ ‘[Tjhere’s not much left of the immutability theory, is there?’ ”) (quoting J. Ely, Democracy and Distrust 150 (1980)); Cleburne, 473 U.S. at 472 n. 24, 105 S.Ct. 3249 (Marshall, J., concurring in part and dissenting in part) (“The ‘political powerlessness’ of a group may be relevant, but that factor is neither necessary, as the gender cases demonstrate, nor sufficient, as the example of minors illustrates.”); Nyquist v. Mauclet, 432 U.S. 1, 9 n. 11, 97 S.Ct. 2120, 53 L.Ed.2d 63 (1977) (rejecting the argument that alienage did not deserve strict scrutiny because it was not immutable); see also Pedersen, — F.Supp.2d at -, 2012 WL 3113883, at *13; Golinsky 824 F.Supp.2d at 983; Kerrigan v. Comm’r. of Pub. Health, 289 Conn. 135, 167-68, 957 A.2d 407 (2008). Nevertheless, immutability and political power are indicative, and we consider them here. In this case, all four factors justify heightened scrutiny: A) homosexuals as a group have historically endured persecution and dis *182 crimination; B) homosexuality has no relation to aptitude or ability to contribute to society; C) homosexuals are a discernible group with non-obvious distinguishing characteristics, especially in the subset of those who enter same-sex marriages; and D) the class remains a politically weakened minority.
A) History of Discrimination
It is easy to conclude that homosexuals have suffered a history of discrimination. Windsor and several amici labor to establish and document this history, but we think it is not much in debate. Perhaps the most telling proof of animus and discrimination against homosexuals in this country is that, for many years and in many states, homosexual conduct was criminal. These laws had the imprimatur of the Supreme Court. See Bowers, 478 U.S. at 196, 106 S.Ct. 2841; see also Lawrence, 539 U.S. at 578, 123 S.Ct. 2472 (noting that such laws “demean[ed homosexuals’] existence [and] controlled] their destiny”).
BLAG argues that discrimination against homosexuals differs from that against racial minorities and women because “homosexuals as a class have never been politically disenfranchised.” True, but the difference is not decisive. Citizens born out of wedlock have never been inhibited in voting; yet the Supreme Court has applied intermediate scrutiny in cases of illegitimacy. See generally Lalli v. Lalli, 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978). Second, BLAG argues that, unlike protected classes, homosexuals have not “suffered discrimination for longer than history has been recorded.” But whether such discrimination existed in Babylon is neither here nor there. BLAG concedes that homosexuals have endured discrimination in this country since at least the 1920s. Ninety years of discrimination is entirely sufficient to document a “history of discrimination.” See Pedersen, — F.Supp.2d at -, 2012 WL 3113883, at *21 (summarizing that “the majority of cases which have meaningfully considered the question [have] likewise held that homosexuals as a class have experienced a long history of discrimination”).
B) Relation to Ability
Also easy to decide in this case is whether the class characteristic “frequently bears [a] relation to ability to perform or contribute to society.” Cleburne, 473 U.S. at 440-41, 105 S.Ct. 3249; see Frontiero, 411 U.S. at 686, 93 S.Ct. 1764 (“[W]hat differentiates sex from such non-suspect statuses as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society.”). In Cleburne, the Supreme Court ruled that heightened scrutiny was inappropriate because “those who are mentally retarded have a reduced ability to cope with and function in the everyday world.” 473 U.S. at 442, 105 S.Ct. 3249. The Court employed similar reasoning with respect to age classifications, finding that heightened scrutiny was not appropriate for mandatory retirement laws because “physical ability generally declines with age” and such requirements reasonably “serve[d] to remove from ... service those whose fitness for uniformed work presumptively has diminished with age.” Murgia, 427 U.S. at 316, 96 S.Ct. 2562.
There is no such impairment here. There are some distinguishing characteristics, such as age or mental handicap, that may arguably inhibit an individual’s ability to contribute to society, at least in some respect. But homosexuality is not one of them. The aversion homosexuals experi *183 ence has nothing to do with aptitude or performance.
We do not understand BLAG to argue otherwise. Rather, BLAG suggests that the proper consideration is whether “the classification turns on ‘distinguishing characteristics relevant to interests the State has the authority to implement,’ ” quoting Cleburne, 473 U.S. at 441, 105 S.Ct. 3249. Thus, BLAG urges that same-sex couples have a diminished ability to discharge family roles in procreation and the raising of children. BLAG cites no precedential application of that standard to support its interpretation, and it is inconsistent with actual cases. See, e.g., Frontiero, 411 U.S. at 686, 93 S.Ct. 1764 (distinguishing that sex, unlike intelligence, has no bearing on one’s general ability to contribute to society). In any event, the abilities or inabilities cited by BLAG bear upon whether the law withstands scrutiny (the second step of analysis) rather than upon the level of scrutiny to apply. Cf. Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (defining the test for intermediate scrutiny as whether a classification is “substantially related to an important government interest”).
C) Distinguishing Characteristic
We conclude that homosexuality is a sufficiently discernible characteristic to define a discrete minority class. See Rowland v. Mad River Local School Dist., Montgomery County, Ohio, 470 U.S. 1009, 1014, 105 S.Ct. 1373, 84 L.Ed.2d 392 (1985) (Brennan, /., dissenting from denial of certiorari) (“[H]omosexuals constitute a significant and insular minority of this country’s population.”).
This consideration is often couched in terms of “immutability.” BLAG and its amici argue that sexual orientation is not necessarily fixed, suggesting that it may change over time, range along a continuum, and overlap (for bisexuals). But the test is broader: whether there are “obvious, immutable, or distinguishing characteristics that define ... a discrete group.” See Bowen, 483 U.S. at 602, 107 S.Ct. 3008 (emphasis added). No “obvious badge” is necessary. See Mathews v. Lucas, 427 U.S. 495, 506, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976). Classifications based on alienage, illegitimacy, and national origin are all subject to heightened scrutiny, Cleburne, 473 U.S. at 440-41, 105 S.Ct. 3249, even though these characteristics do not declare themselves, and often may be disclosed or suppressed as a matter of preference.[4] What seems to matter is whether the characteristic of the class calls down discrimination when it is manifest.
Thus a person of illegitimate birth may keep that status private, and ensure that no outward sign discloses the status in *184 social settings or in the workplace, or on the subway. But when such a person applies for Social Security benefits on the death of a parent (for example), the illegitimate status becomes manifest. The characteristic is necessarily revealed in order to exercise a legal right. Similarly, sexual preference is necessarily disclosed when two persons of the same sex apply for a marriage license (as they are legally permitted to do in New York), or when a surviving spouse of a same-sex marriage seeks the benefit of the spousal deduction (as Windsor does here).
BLAG argues that a classification based on sexual orientation would be more “amorphous” than discrete. It may be that the category exceeds the number of persons whose sexual orientation is outwardly “obvious, immutable, or distinguishing,” and who thereby predictably undergo discrimination. But that is surely also true of illegitimacy and national origin. Again, what matters here is whether the characteristic invites discrimination when it is manifest.
The class affected by Section 8 of DOMA is composed entirely of persons of the same sex who have married each other. Such persons constitute a subset of the larger category of homosexuals; but as counsel for BLAG conceded at argument, there is nothing amorphous, capricious, or tentative about their sexual orientation. Oral Arg. Tr. 12:11-14. Married same-sex couples like Windsor and Spyer are the population most visible to the law, and they are foremost in mind when reviewing DOMA’s constitutionality.
We therefore conclude that sexual orientation is a sufficiently distinguishing characteristic to identify the discrete minority class of homosexuals.
D) Political Power
Finally, we consider whether homosexuals are a politically powerless minority. See Bowen, 483 U.S. at 602, 107 S.Ct. 3008. Without political power, minorities may be unable to protect themselves from discrimination at the hands of. the majoritarian political process. We.conclude that homosexuals -are still significantly encumbered in this respect.
The question is not whether homosexuals have achieved political successes over the years; they clearly have. The question is whether they have the strength to politically protect themselves from wrongful discrimination. When the Supreme Court ruled that sex-based classifications were subject to heightened scrutiny in 1973, the Court acknowledged that women had already achieved major political victories. See Frontiero, 411 U.S. at 685, 93 S.Ct. 1764. The Nineteenth Amendment had been ratified in 1920, and Title VII had already outlawed sex-based employment. See 78 Stat. 253. The Court was persuaded nevertheless that women still lacked adequate political power, in part because they were “vastly underrepresented in this Nation’s decisionmaking councils,” including the presidency, the Supreme Court, and the legislature. Frontiero, 411 U.S. at 686 n. 17, 93 S.Ct. 1764.
There are parallels between the status of women at the time of Frontiero and homosexuals today: their position “has improved markedly in recent decades,” but they still “face pervasive, although at times more subtle, discrimination ... in the political arena.” Frontiero, 411 U.S. at 685-86, 93 S.Ct. 1764. It is difficult to say whether homosexuals are “under-represented” in positions of power and authority without knowing their number relative to the heterosexual population. But it is safe to say that the seemingly small number of acknowledged homosexuals so situated is attributable either to a hostility that ex- *185 eludes them or to a hostility that keeps their sexual preference private — which, for our purposes, amounts to much the same thing. Moreover, the same considerations can be expected to suppress some degree of political activity by inhibiting the kind of open association that advances political agendas. See Rowland, 470 U.S. at 1014, 105 S.Ct. 1373 (Brennan, J., dissenting from denial of certiorari) (“Because of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena.”).
In sum, homosexuals are not in a position to adequately protect themselves from the discriminatory wishes of the majoritarian public.
* * *
Analysis of these four factors supports our conclusion that homosexuals compose a class that is subject to heightened scrutiny. We further conclude that the class is quasi-suspect (rather than suspect) based on the weight of the factors and on analogy to the classifications recognized as suspect and quasi-suspect. While homosexuals have been the target of significant and long-standing discrimination in public and private spheres, this mistreatment “is not sufficient to require ‘our most exacting scrutiny.’ ” Trimble v. Gordon, 430 U.S. 762, 767, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (quoting Mathews v. Lucas, 427 U.S. 495, 506, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976)).
The next step is to determine whether DOMA survives intermediate scrutiny review.
IV
To withstand intermediate scrutiny, a classification must be “substantially related to an important government interest.” Clark v. Jeter, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). “Substantially related” means that the explanation must be “ ‘exceedingly persuasive.’” United States v. Virginia, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (quoting Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982)). “The justification must be genuine, not hypothesized or invented post hoc in response to litigation.” Id.
BLAG advances two primary arguments for why Congress enacted DOMA. First, it cites “unique federal interests,” which include maintaining a consistent federal definition of marriage, protecting the fisc, and avoiding “the unknown consequences of a novel redefinition of a foundational social institution.” Second, BLAG argues that Congress enacted the statute to encourage “responsible procreation.” At argument, BLAG’s counsel all but conceded that these reasons for enacting DOMA may not withstand intermediate scrutiny. Oral Arg. Tr. 16:24-17:6.
A) Maintaining a “Uniform Definition” of Marriage
Statements in the Congressional Record express an intent to enforce uniform eligibility for federal marital benefits by insuring that same-sex couples receive — or lose — the same federal benefits across all states.[5] However, the emphasis on uniformity is suspicious because Congress and the Supreme Court have historically deferred to state domestic relations laws, irrespective of their variations.
*186 To the extent that there has ever been “uniform” or “consistent” rule in federal law concerning marriage, it is that marriage is “a virtually exclusive province of the States.” Sosna, 419 U.S. at 404, 95 S.Ct. 553. As the Supreme Court has emphasized, “the states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce.... [T]he Constitution delegated no authority to the Government of the United States on the subject of marriage and divorce.” Haddock v. Haddock, 201 U.S. 562, 575, 26 S.Ct. 525, 50 L.Ed. 867 (1906) (emphasis added), overruled on other grounds by Williams v. State of North Carolina, 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942). DOMA was therefore an unprecedented intrusion “into an area of traditional state regulation.” Massachusetts, 682 F.3d at 13. This is a reason to look upon Section 3 of DOMA with a cold eye. “The absence of precedent ... is itself instructive; ‘[discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.’ ” Romer v. Evans, 517 U.S. 620, 633, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (quoting Louisville Gas & Elec. Co. v. Coleman, 277 U.S. 32, 37-38, 48 S.Ct. 423, 72 L.Ed. 770 (1928)).
Moreover, DOMA’s sweep arguably creates more discord and anomaly than uniformity, as many amici observe. Because DOMA defined only a single aspect of domestic relations law, it left standing all other inconsistencies in the laws of the states, such as minimum age, consanguinity, divorce, and paternity. See Br. of Amici Curiae Family Law Professors Supporting Petitioner at 12-13 (noting that “the federal government has always accepted the states’ different ways of defining parental status” and offering numerous examples of critical differences in state parental policies).
The uniformity rationale is further undermined by inefficiencies that it creates. As a district court in this Circuit found, it was simpler — and more consistent — for the federal government to ask whether a couple was married under the law of the state of domicile, rather than adding “an additional criterion, requiring the federal government to identify and exclude all same-sex marital unions from federal recognition.” Pedersen, — F.Supp.2d at -, 2012 WL 3113883, at *48; see Golinski, 824 F.Supp.2d at 1001-02 (“The passage of DOMA actually undermined administrative consistency by requiring that the federal government, for the first time, discern which state definitions of marriage are entitled to federal recognition and which are not.”).
Because DOMA is an unprecedented breach of longstanding deference to federalism that singles out same-sex marriage as the only inconsistency (among many) in state law that requires a federal rule to achieve uniformity, the rationale premised on uniformity is not an exceedingly persuasive justification for DOMA.
B) Protecting the Fisc
Another professed goal of Congress is to save government resources by limiting the beneficiaries of government marital benefits. H.R.Rep. No. 104-664, at 18 (1996), reprinted in 1996 U.S.C.C.A.N. 2905, 2922. Fiscal prudence is undoubtedly an important government interest. Windsor and certain amici contest whether the measure will achieve a net benefit to the Treasury; but in matters of the federal budget, Congress has the prerogative to err (if error it is), and cannot be expected to prophesy the future accurately. But the Supreme Court has held that “[t]he saving of welfare costs cannot justify an otherwise invidious classification.” Graham v. Rich *187 ardson, 403 U.S. 365, 375, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (quotation marks omitted). As the district court observed, “excluding any arbitrarily chosen group of individuals from a government program conserves government resources.” Windsor, 833 F.Supp.2d at 406 (quotation marks).
Citing Bowen v. Owens, 476 U.S. 340, 348, 106 S.Ct. 1881, 90 L.Ed.2d 316 (1986), BLAG draws the distinction that DOMA did not withdraw benefits from same-sex spouses; since DOMA was enacted before same-sex marriage was permitted in any state, DOMA operated to prevent the extension of benefits to people who never enjoyed them. However, Bowen was decided on rational basis grounds and did not involve an invidious classification. Id. at 349-50, 106 S.Ct. 1881. Moreover, DOMA is properly considered a benefit withdrawal in the sense that it functionally eliminated longstanding federal recognition of all marriages that are properly ratified under state law—and the federal benefits (and detriments) that come with that recognition.
Furthermore, DOMA is so broad, touching more than a thousand federal laws, that it is not substantially related to fiscal matters. As amicus Citizens for Responsibility and Ethics in Washington demonstrates, DOMA impairs a number of federal laws (involving bankruptcy and conflict-of-interest) that have nothing to do with the public fisc. See Br. of Amicus Curiae Citizens for Responsibility and Ethics in Washington at 5-11, 18-23. DOMA transcends a legislative intent to conserve public resources.
For these reasons, DOMA is not substantially related to the important government interest of protecting the fisc.
C) Preserving a Traditional Understanding of Marriage
Congress undertook to justify DOMA as a measure for preserving traditional marriage as an institution. 150 Cong. Rec. 14951. But “[a]neient lineage of a legal concept does not give [a law] immunity from attack for lacking a rational basis.” Heller, 509 U.S. at 326, 113 S.Ct. 2637. A fortiori tradition is hard to justify as meeting the more demanding test of having a substantial relation to an important government interest. Similar appeals to tradition were made and rejected in litigation concerning anti-sodomy laws. See Lawrence, 539 U.S. at 577-78, 123 S.Ct. 2472 (“ ‘[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack.’”) (quoting Bowers, 478 U.S. at 216, 106 S.Ct. 2841 (Stevens, J., dissenting)) (emphasis added).
Even if preserving tradition were in itself an important goal, DOMA is not a means to achieve it. As the district court found: “because the decision of whether same-sex couples can marry is left to the states, DOMA does not, strictly speaking, ‘preserve’ the institution of marriage as one between a man and a woman.” Windsor, 833 F.Supp.2d at 403.
Preservation of a traditional understanding of marriage therefore is not an exceedingly persuasive justification for DOMA.
D) Encouraging Responsible Procreation
Finally, BLAG presents three related reasons why DOMA advances the goals of “responsible childrearing”: DOMA subsidizes procreation because *188 only opposite-sex couples can procreate “naturally”; DOMA subsidizes biological parenting (for more or less the same reason); and DOMA facilitates the optimal parenting arrangement of a mother and a father. We agree that promotion of procreation can be an important government objective. But we do not see how DOMA is substantially related to it.
All three proffered rationales have the same defect: they are cast as incentives for heterosexual couples, incentives that DOMA does not affect in any way. DOMA does not provide any incremental reason for opposite-sex couples to engage in “responsible procreation.”[6] Incentives for opposite-sex couples to marry and procreate (or not) were the same after DOMA was enacted as they were before.[7] Other courts have likewise been unable to find even a rational connection between DOMA and encouragement of responsible procreation and child-rearing. See Massachusetts, 682 F.3d at 14-15 (underscoring the “lack of any demonstrated connection between DOMA’s treatment of same-sex couples and its asserted goal of strengthening the bonds and benefits to society of heterosexual marriage”) (citations omitted); Windsor, 833 F.Supp.2d at 404-05; Pedersen, — F.Supp.2d at — - —, 2012 WL 3113883, at *40-43.
DOMA is therefore not substantially related to the important government interest of encouraging procreation.
* * *
DOMA’s classification of same-sex spouses was not substantially related to an important government interest. Accordingly, we hold that Section 3 of DOMA violates equal protection and is therefore unconstitutional.
V
Our straightforward legal analysis sidesteps the fair point that same-sex marriage is unknown to history and tradition. But law (federal or state) is not concerned with holy matrimony. Government deals with marriage as a civil status — however fundamental — and New York has elected to extend that status to same-sex couples. A state may enforce and dissolve a couple’s marriage, but it cannot sanctify or bless it. For that, the pair must go next door.
CONCLUSION
For the foregoing reasons, we AFFIRM the grant of Windsor’s motion for summary judgment.

. See Massachusetts v. U.S. Dep’t. of HHS, 682 F.3d 1, 8 (1st Cir.2012) (finding that Baiter permitted equal protection review so long as arguments did not "rest on a constitutional right to same-sex marriage”); Windsor, 833 F.Supp.2d at 399-400 ("The case before the Court does not present the same issue as that presented in Baker.... Accordingly, after comparing the issues in Baker and those in the instant case, the Court does not believe that Baker 'necessarily decided' the question of whether DOMA violates the Fifth Amendment’s Equal Protection Clause.”); Pedersen v. Office of Pers. Mngmt., No. 3:10-cv-1750, - F.Supp.2d -, -, 2012 WL 3113883, at *11 (D.Conn. July 31, 2012) ("DOMA impacts federal benefits and obligations, but does not prohibit a state from authorizing or forbidding same-sex marriage, as was the case in Baker."); Golinski v. U.S. Office of Pers. Mgmt., 824 F.Supp.2d 968, 982 n. 5 (N.D.Cal.2012) ("The failure of the federal government to recognize Ms. Golinski's marriage and to provide benefits does not alter the fact that she is married under state law.”); Dragovich v. U.S. Dept. of Treasury, No. 4:10-cv01564-CW, 872 F.Supp.2d 944, 951-53, 2012 WL 1909603, at *6-7 (N.D.Cal. May 24, 2012); Smelt v. Cnty. of Orange, 374 F.Supp.2d. 861, 872-74 (C.D.Cal.2005), vacated in part on other grounds, 447 F.3d 673 (9th Cir.2006); In re Kandu, 315 B.R. 123, 135-38 (Bankr.W.D.Wash.2004); see also Perry v. Brown, 671 F.3d 1052, 1082 n. 14 (9th Cir.2012) (finding that Baker did not preempt consideration of Proposition 8 case, because "the question of the constitutionality of a state's ban on same-sex marriage” was not before the court) (emphasis added).

. While other classifications have been deemed quasi-suspect or suspect over the years, the decisions to add sex and illegitimacy are especially helpful in analyzing whether the classification made in DOMA merits intermediate scrutiny.

. Compare Lawrence, 539 U.S. at 580, 123 S.Ct. 2472 (O'Connor, J., concurring) (“When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.”) and U.S. R.R. Ret. Bd. v. Fritz, 449 U.S. 166, 188, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (Brennan, J., dissenting) (“In other cases, however, the courts must probe more deeply.”) with City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 459-60, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (Marshall, J., concurring in part and dissenting in part) (“The refusal to acknowledge that something more than minimum rationality review is at work here is, in my view, unfortunate____[B]y failing to articulate the factors that justify today's 'second order' rational-basis review, the Court provides no principled foundation for determining when more searching inquiry is to be invoked. Lower courts are thus left in the dark on this important question, and this Court remains unaccountable for its decisions employing, or refusing to employ, particularly searching scrutiny.”) and Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 321, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (Marshall, J., dissenting) ("[T]he Court has rejected, albeit Sub silentio, its most deferential statements of the rationality standard in assessing the validity under the Equal Protection Clause of much noneconomic legislation.”). But see U.S. R.R. Ret. Bd., 449 U.S. at 176 n. 10, 101 S.Ct. 453 ("The comments in the dissenting opinion about the proper cases for which to look for the correct statement of the equal protection rational-basis standard, and about which cases limit earlier cases, are just that: comments in a dissenting opinion.”).

. Alienage and illegitimacy are actually subject to change. See Pedersen, - F.Supp.2d at -, 2012 WL 3113883, at *23 ("The Supreme Court has held that resident aliens constitute a suspect class despite the ability to opt out of the class voluntarily. Additionally, one's status as illegitimate may be subject to change and is therefore not a strictly immutable characteristic.”) (internal citation omitted); see also Watkins v. U.S. Army, 875 F.2d 699, 726 (9th Cir.1989) (Norris, J., concurring) ("It is clear that by 'immutability' the [Supreme] Court has never meant strict immutability in the sense that members of the class must be physically unable to change or mask the trait defining their class. People can have operations to change their sex. Aliens can ordinarily become naturalized citizens. The status of illegitimate children can be changed. People can frequently hide their national origin by changing their customs, their names, or their associations.... At a minimum, then, the Supreme Court is willing to treat a trait as effectively immutable if changing it would involve great difficulty, such as requiring a major physical change or a traumatic change of identity.").

. For example, certain legislators were concerned that it would be administratively difficult to deal with benefit changes as same-sex couples moved between states with different policies on same-sex marriage. See, e.g., 150 Cong. Rec. 15318 (2004) (Sen. Inhofe).

. "[T]he argument drat withdrawing the designation of 'marriage' from same-sex couples could on its own promote the strength or stability of opposite-sex marital relationships lacks any such footing in reality.” Perry v. Brown, 671 F.3d 1052, 1089 (9th Cir.2012).

. To the extent that BLAG is suggesting that Congress' laws might actually influence sexual orientation, there is no evidence to support that claim (and it strikes us as farfetched).