Chief Justice ROBERTS, dissenting.
I agree with Justice SCALIA that this Court lacks jurisdiction to review the decisions of the courts below. On the merits of the constitutional dispute the Court decides to decide, I also agree with Justice SCALIA that Congress acted constitutionally in passing the Defense of Marriage Act (DOMA). Interests in uniformity and stability amply justified Congress's decision to retain the definition of marriage that, at that point, had been adopted by every State in our Nation, and every nation in the world. Post, at 2707 - 2708 (dissenting opinion).
The majority sees a more sinister motive, pointing out that the Federal Government has generally (though not uniformly) deferred to state definitions of marriage in the past. That is true, of course, but none of those prior state-by-state *776 variations had involved differences over something-as the majority puts it-"thought of by most people as essential to the very definition of [marriage] and to its role and function throughout the history of civilization." Ante, at 2689. That the Federal Government treated this fundamental question differently than it treated variations over consanguinity or minimum age is hardly surprising-and hardly enough to support a conclusion that the "principal purpose," ante, at 2694, of the 342 Representatives and 85 Senators who voted for it, and the President who signed it, was a bare desire to harm. Nor do the snippets of legislative history and the banal title of the Act to which the majority points suffice to make such a showing. At least without some more convincing evidence that the Act's principal purpose was to codify malice, and that it furthered no legitimate government interests, I would not tar the political branches with the brush of bigotry.
But while I disagree with the result to which the majority's analysis leads it in this case, I think it more important to point out that its analysis leads no further. The Court does not have before it, and the logic of its opinion does not decide, the distinct question whether the States, in the exercise of their "historic and essential authority to define the marital relation," ante, at 2692, may continue to utilize the traditional definition of marriage.
The majority goes out of its way to make this explicit in the penultimate sentence of its opinion. It states that "[t]his opinion and its holding are confined to those lawful marriages," ante, at 2696 -referring to same-sex marriages that a State has already recognized as a result of the local "community's considered perspective on the historical roots of the institution of marriage and its evolving understanding of the meaning of equality." Ante, at 2681. Justice SCALIA believes this is a " 'bald, unreasoned disclaime[r].' "
*2697 Post, at 2709. In my view, though, the disclaimer is a logical and necessary consequence of the argument the majority has chosen to *777 adopt. The dominant theme of the majority opinion is that the Federal Government's intrusion into an area "central to state domestic relations law applicable to its residents and citizens" is sufficiently " unusual" to set off alarm bells. Ante, at 2690, 2692. I think the majority goes off course, as I have said, but it is undeniable that its judgment is based on federalism.
The majority extensively chronicles DOMA's departure from the normal allocation of responsibility between State and Federal Governments, emphasizing that DOMA "rejects the long-established precept that the incidents, benefits, and obligations of marriage are uniform for all married couples within each State." Ante, at 2692. But there is no such departure when one State adopts or keeps a definition of marriage that differs from that of its neighbor, for it is entirely expected that state definitions would "vary, subject to constitutional guarantees, from one State to the next." Ibid . Thus, while "[t]he State's power in defining the marital relation is of central relevance" to the majority's decision to strike down DOMA here, ibid., that power will come into play on the other side of the board in future cases about the constitutionality of state marriage definitions. So too will the concerns for state diversity and sovereignty that weigh against DOMA's constitutionality in this case. See ante, at 2692.
It is not just this central feature of the majority's analysis that is unique to DOMA, but many considerations on the periphery as well. For example, the majority focuses on the legislative history and title of this particular Act, ante, at 2693; those statute-specific considerations will, of course, be irrelevant in future cases about different statutes. The majority emphasizes that DOMA was a "systemwide enactment with no identified connection to any particular area of federal law," but a State's definition of marriage "is the foundation of the State's broader authority to regulate the subject of domestic relations with respect to the '[p]rotection of *778 offspring, property interests, and the enforcement of marital responsibilities.' " Ante, at 2694, 2690. And the federal decision undermined (in the majority's view) the " dignity [already] conferred by the States in the exercise of their sovereign power," ante, at 2693, whereas a State's decision whether to expand the definition of marriage from its traditional contours involves no similar concern.
We may in the future have to resolve challenges to state marriage definitions affecting same-sex couples. That issue, however, is not before us in this case, and we hold today that we lack jurisdiction to consider it in the particular context of Hollingsworth v. Perry, --- U.S., at ----, 133 S.Ct. 1521. I write only to highlight the limits of the majority's holding and reasoning today, lest its opinion be taken to resolve not only a question that I believe is not properly before us-DOMA's constitutionality-but also a question that all agree, and the Court explicitly acknowledges, is not at issue.
Justice SCALIA, with whom Justice THOMAS joins, and with whom THE CHIEF JUSTICE joins as to Part I, dissenting.
This case is about power in several respects. It is about the power of our people to govern themselves, and the power of this Court to pronounce the law. Today's opinion aggrandizes the latter, with the predictable consequence of diminishing the former. We have no power to decide this case. And even if we did, we have no *2698 power under the Constitution to invalidate this democratically adopted legislation. The Court's errors on both points spring forth from the same diseased root: an exalted conception of the role of this institution in America.
I
A
The Court is eager-hungry -to tell everyone its view of the legal question at the heart of this case. Standing in the way is an obstacle, a technicality of little interest to anyone *779 but the people of We the People, who created it as a barrier against judges' intrusion into their lives. They gave judges, in Article III, only the "judicial Power," a power to decide not abstract questions but real, concrete "Cases" and "Controversies." Yet the plaintiff and the Government agree entirely on what should happen in this lawsuit. They agree that the court below got it right; and they agreed in the court below that the court below that one got it right as well. What, then, are we doing here?
The answer lies at the heart of the jurisdictional portion of today's opinion, where a single sentence lays bare the majority's vision of our role. The Court says that we have the power to decide this case because if we did not, then our "primary role in determining the constitutionality of a law" (at least one that "has inflicted real injury on a plaintiff") would "become only secondary to the President's." Ante, at 2688. But wait, the reader wonders-Windsor won below, and so cured her injury, and the President was glad to see it. True, says the majority, but judicial review must march on regardless, lest we "undermine the clear dictate of the separation-of-powers principle that when an Act of Congress is alleged to conflict with the Constitution, it is emphatically the province and duty of the judicial department to say what the law is." Ibid. (internal quotation marks and brackets omitted).
That is jaw-dropping. It is an assertion of judicial supremacy over the people's Representatives in Congress and the Executive. It envisions a Supreme Court standing (or rather enthroned) at the apex of government, empowered to decide all constitutional questions, always and everywhere "primary" in its role.
This image of the Court would have been unrecognizable to those who wrote and ratified our national charter. They knew well the dangers of "primary" power, and so created branches of government that would be "perfectly coordinate by the terms of their common commission," none of which *780 branches could " pretend to an exclusive or superior right of settling the boundaries between their respective powers." The Federalist, No. 49, p. 314 (C. Rossiter ed. 1961) (J. Madison). The people did this to protect themselves. They did it to guard their right to self-rule against the black-robed supremacy that today's majority finds so attractive. So it was that Madison could confidently state, with no fear of contradiction, that there was nothing of "greater intrinsic value" or "stamped with the authority of more enlightened patrons of liberty" than a government of separate and coordinate powers. Id ., No. 47, at 301.
For this reason we are quite forbidden to say what the law is whenever (as today's opinion asserts) " 'an Act of Congress is alleged to conflict with the Constitution.' " Ante, at 2688. We can do so only when that allegation will determine the outcome of a lawsuit, and is contradicted by the other party. The "judicial Power" is not, as the majority believes, the power " 'to say what the law is,' " ibid., giving the Supreme Court the "primary role in determining the constitutionality of laws." The *2699 majority must have in mind one of the foreign constitutions that pronounces such primacy for its constitutional court and allows that primacy to be exercised in contexts other than a lawsuit. See, e.g., Basic Law for the Federal Republic of Germany, Art. 93. The judicial power as Americans have understood it (and their English ancestors before them) is the power to adjudicate, with conclusive effect, disputed government claims (civil or criminal) against private persons, and disputed claims by private persons against the government or other private persons. Sometimes (though not always) the parties before the court disagree not with regard to the facts of their case (or not only with regard to the facts) but with regard to the applicable law-in which event (and only in which event) it becomes the " 'province and duty of the judicial department to say what the law is.' " Ante, at 2688. *781 In other words, declaring the compatibility of state or federal laws with the Constitution is not only not the "primary role" of this Court, it is not a separate, free-standing role at all. We perform that role incidentally-by accident, as it were-when that is necessary to resolve the dispute before us. Then, and only then, does it become " 'the province and duty of the judicial department to say what the law is.' " That is why, in 1793, we politely declined the Washington Administration's request to "say what the law is" on a particular treaty matter that was not the subject of a concrete legal controversy. 3 Correspondence and Public Papers of John Jay 486-489 (H. Johnston ed. 1893). And that is why, as our opinions have said, some questions of law will never be presented to this Court, because there will never be anyone with standing to bring a lawsuit. See Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) ; United States v. Richardson, 418 U.S. 166, 179, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). As Justice Brandeis put it, we cannot "pass upon the constitutionality of legislation in a friendly, non-adversary, proceeding"; absent a " 'real, earnest and vital controversy between individuals,' " we have neither any work to do nor any power to do it. Ashwander v. TVA, 297 U.S. 288, 346, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (concurring opinion) (quoting Chicago & Grand Trunk R. Co. v. Wellman, 143 U.S. 339, 345, 12 S.Ct. 400, 36 L.Ed. 176 (1892) ). Our authority begins and ends with the need to adjudge the rights of an injured party who stands before us seeking redress. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).
That is completely absent here. Windsor's injury was cured by the judgment in her favor. And while, in ordinary circumstances, the United States is injured by a directive to pay a tax refund, this suit is far from ordinary. Whatever injury the United States has suffered will surely not be redressed by the action that it, as a litigant, asks us to take. The final sentence of the Solicitor General's brief on the merits reads: "For the foregoing reasons, the judgment of the *782 court of appeals should be affirmed ." Brief for United States (merits) 54 (emphasis added). That will not cure the Government's injury, but carve it into stone. One could spend many fruitless afternoons ransacking our library for any other petitioner's brief seeking an affirmance of the judgment against it.[1] *2700 What the petitioner United States asks us to do in the case before us is exactly what the respondent Windsor asks us to do: not to provide relief from the judgment below but to say that that judgment was correct. And the same was true in the Court of Appeals: Neither party sought to undo the judgment for Windsor, and so that court should have dismissed the appeal (just as we should dismiss) for lack of jurisdiction. Since both parties agreed with the judgment of the District Court for the Southern District of New York, the suit should have ended there. The further proceedings have been a contrivance, having no object in mind except to elevate a District Court judgment that has no precedential effect in other courts, to one that has precedential effect throughout the Second Circuit, and then (in this Court) precedential effect throughout the United States.
We have never before agreed to speak-to "say what the law is"-where there is no controversy before us. In the more than two centuries that this Court has existed as an institution, we have never suggested that we have the power to decide a question when every party agrees with both its nominal opponent and the court below on that question's answer. The United States reluctantly conceded that at oral argument. See Tr. of Oral Arg. 19-20.
*783 The closest we have ever come to what the Court blesses today was our opinion in INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). But in that case, two parties to the litigation disagreed with the position of the United States and with the court below: the House and Senate, which had intervened in the case. Because Chadha concerned the validity of a mode of congressional action-the one-house legislative veto-the House and Senate were threatened with destruction of what they claimed to be one of their institutional powers. The Executive choosing not to defend that power,[2] we permitted the House and Senate to intervene. Nothing like that is present here.
To be sure, the Court in Chadha said that statutory aggrieved-party status was "not altered by the fact that the Executive may agree with the holding that the statute in question is unconstitutional." Id., at 930-931, 103 S.Ct. 2764. But in a footnote to that statement, the Court acknowledged Article III's separate requirement of a "justiciable case or controversy," and stated that this requirement was satisfied "because of the presence of the two Houses of Congress as adverse parties." Id., at 931, n. 6, 103 S.Ct. 2764. Later in its opinion, the Chadha Court remarked that the United States' announced intention to enforce the statute also sufficed to permit judicial review, even absent congressional participation.
*784 Id., at 939, 103 S.Ct. 2764. That remark is true, as a description of the judicial review conducted in the Court of Appeals, where the Houses of Congress *2701 had not intervened. (The case originated in the Court of Appeals, since it sought review of agency action under 8 U.S.C. § 1105a(a) (1976 ed.).) There, absent a judgment setting aside the INS order, Chadha faced deportation. This passage of our opinion seems to be addressing that initial standing in the Court of Appeals, as indicated by its quotation from the lower court's opinion, 462 U.S., at 939-940, 103 S.Ct. 2764. But if it was addressing standing to pursue the appeal, the remark was both the purest dictum (as congressional intervention at that point made the required adverseness "beyond doubt," id., at 939, 103 S.Ct. 2764), and quite incorrect. When a private party has a judicial decree safely in hand to prevent his injury, additional judicial action requires that a party injured by the decree seek to undo it . In Chadha, the intervening House and Senate fulfilled that requirement. Here no one does.
The majority's discussion of the requirements of Article III bears no resemblance to our jurisprudence. It accuses the amicus (appointed to argue against our jurisdiction) of "elid[ing] the distinction between ... the jurisdictional requirements of Article III and the prudential limits on its exercise." Ante, at 2685. It then proceeds to call the requirement of adverseness a "prudential" aspect of standing. Of standing . That is incomprehensible. A plaintiff (or appellant) can have all the standing in the world-satisfying all three standing requirements of Lujan that the majority so carefully quotes, ante, at 2686 -and yet no Article III controversy may be before the court. Article III requires not just a plaintiff (or appellant) who has standing to complain but an opposing party who denies the validity of the complaint. It is not the amicus that has done the eliding of distinctions, but the majority, calling the quite separate Article III requirement of adverseness between the parties an element (which it then pronounces a "prudential" element) of standing.
*785 The question here is not whether, as the majority puts it, "the United States retains a stake sufficient to support Article III jurisdiction," ibid. the question is whether there is any controversy (which requires contradiction ) between the United States and Ms. Windsor. There is not.
I find it wryly amusing that the majority seeks to dismiss the requirement of party-adverseness as nothing more than a "prudential" aspect of the sole Article III requirement of standing. (Relegating a jurisdictional requirement to "prudential" status is a wondrous device, enabling courts to ignore the requirement whenever they believe it "prudent"-which is to say, a good idea.) Half a century ago, a Court similarly bent upon announcing its view regarding the constitutionality of a federal statute achieved that goal by effecting a remarkably similar but completely opposite distortion of the principles limiting our jurisdiction. The Court's notorious opinion in Flast v. Cohen, 392 U.S. 83, 98-101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), held that standing was merely an element (which it pronounced to be a "prudential" element) of the sole Article III requirement of adverseness . We have been living with the chaos created by that power-grabbing decision ever since, see Hein v. Freedom From Religion Foundation, Inc., 551 U.S. 587, 127 S.Ct. 2553, 168 L.Ed.2d 424 (2007), as we will have to live with the chaos created by this one.
The authorities the majority cites fall miles short of supporting the counterintuitive notion that an Article III "controversy" can exist without disagreement between the parties. In Deposit Guaranty Nat. Bank v. Roper, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), the District Court had entered judgment in the individual plaintiff's favor based on the *2702 defendant bank's offer to pay the full amount claimed. The plaintiff, however, sought to appeal the District Court's denial of class certification under Federal Rule of Civil Procedure 23. There was a continuing dispute between the parties concerning the issue raised on appeal. The same is true of the other case cited by the majority, Camreta v. Greene, 563 U.S. ----, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011). *786 There the District Court found that the defendant state officers had violated the Fourth Amendment, but rendered judgment in their favor because they were entitled to official immunity, application of the Fourth Amendment to their conduct not having been clear at the time of violation. The officers sought to appeal the holding of Fourth Amendment violation, which would circumscribe their future conduct; the plaintiff continued to insist that a Fourth Amendment violation had occurred. The "prudential" discretion to which both those cases refer was the discretion to deny an appeal even when a live controversy exists-not the discretion to grant one when it does not. The majority can cite no case in which this Court entertained an appeal in which both parties urged us to affirm the judgment below. And that is because the existence of a controversy is not a "prudential" requirement that we have invented, but an essential element of an Article III case or controversy. The majority's notion that a case between friendly parties can be entertained so long as "adversarial presentation of the issues is assured by the participation of amici curiae prepared to defend with vigor" the other side of the issue, ante, at 2687, effects a breathtaking revolution in our Article III jurisprudence.
It may be argued that if what we say is true some Presidential determinations that statutes are unconstitutional will not be subject to our review. That is as it should be, when both the President and the plaintiff agree that the statute is unconstitutional. Where the Executive is enforcing an unconstitutional law, suit will of course lie; but if, in that suit, the Executive admits the unconstitutionality of the law, the litigation should end in an order or a consent decree enjoining enforcement. This suit saw the light of day only because the President enforced the Act (and thus gave Windsor standing to sue) even though he believed it unconstitutional. He could have equally chosen (more appropriately, some would say) neither to enforce nor to defend the statute he believed to be unconstitutional, see *787 Presidential Authority to Decline to Execute Unconstitutional Statutes, 18 Op. Off. Legal Counsel 199 (Nov. 2, 1994)-in which event Windsor would not have been injured, the District Court could not have refereed this friendly scrimmage, and the Executive's determination of unconstitutionality would have escaped this Court's desire to blurt out its view of the law. The matter would have been left, as so many matters ought to be left, to a tug of war between the President and the Congress, which has innumerable means (up to and including impeachment) of compelling the President to enforce the laws it has written. Or the President could have evaded presentation of the constitutional issue to this Court simply by declining to appeal the District Court and Court of Appeals dispositions he agreed with. Be sure of this much: If a President wants to insulate his judgment of unconstitutionality from our review, he can. What the views urged in this dissent produce is not insulation from judicial review but insulation from Executive contrivance.
The majority brandishes the famous sentence from Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803) that "[i]t is emphatically the province and duty of the judicial department to say what the law is." Ante, at 2688 (internal quotation *2703 marks omitted). But that sentence neither says nor implies that it is always the province and duty of the Court to say what the law is-much less that its responsibility in that regard is a "primary" one. The very next sentence of Chief Justice Marshall's opinion makes the crucial qualification that today's majority ignores: "Those who apply the rule to particular cases, must of necessity expound and interpret that rule." 1 Cranch, at 177 (emphasis added). Only when a "particular case" is before us-that is, a controversy that it is our business to resolve under Article III -do we have the province and duty to pronounce the law. For the views of our early Court more precisely addressing the question before us here, the majority ought instead to have consulted the opinion of Chief Justice Taney in Lord v. Veazie, 8 How. 251, 12 L.Ed. 1067 (1850) :
*788 "The objection in the case before us is ... that the plaintiff and defendant have the same interest, and that interest adverse and in conflict with the interest of third persons, whose rights would be seriously affected if the question of law was decided in the manner that both of the parties to this suit desire it to be.
"A judgment entered under such circumstances, and for such purposes, is a mere form. The whole proceeding was in contempt of the court, and highly reprehensible.... A judgment in form, thus procured, in the eye of the law is no judgment of the court. It is a nullity, and no writ of error will lie upon it. This writ is, therefore, dismissed." Id., at 255-256.
There is, in the words of Marbury, no "necessity [to] expound and interpret" the law in this case; just a desire to place this Court at the center of the Nation's life. 1 Cranch, at 177, 2 L.Ed. 60.
B
A few words in response to the theory of jurisdiction set forth in Justice ALITO's dissent: Though less far reaching in its consequences than the majority's conversion of constitutionally required adverseness into a discretionary element of standing, the theory of that dissent similarly elevates the Court to the "primary" determiner of constitutional questions involving the separation of powers, and, to boot, increases the power of the most dangerous branch: the "legislative department," which by its nature "draw [s] all power into its impetuous vortex." The Federalist, No. 48, at 309 (J. Madison). Heretofore in our national history, the President's failure to "take Care that the Laws be faithfully executed," U.S. Const., Art. II, § 3, could only be brought before a judicial tribunal by someone whose concrete interests were harmed by that alleged failure. Justice ALITO would create a system in which Congress can hale the Executive before the courts not only to vindicate its own institutional *789 powers to act, but to correct a perceived inadequacy in the execution of its laws.[3] This would lay to rest Tocqueville's *2704 praise of our judicial system as one which " intimately bind[s] the case made for the law with the case made for one man," one in which legislation is "no longer exposed to the daily aggression of the parties," and in which "[t]he political question that [the judge] must resolve is linked to the interest" of private litigants. A. de Tocqueville, Democracy in America 97 (H. Mansfield & D. Winthrop eds. 2000). That would be replaced by a system in which Congress and the Executive can pop immediately into court, in their institutional capacity, whenever the President refuses to implement a statute he believes to be unconstitutional, and whenever he implements a law in a manner that is not to Congress's liking.
Justice ALITO's notion of standing will likewise enormously shrink the area to which "judicial censure, exercised *790 by the courts on legislation, cannot extend," ibid. For example, a bare majority of both Houses could bring into court the assertion that the Executive's implementation of welfare programs is too generous-a failure that no other litigant would have standing to complain about. Moreover, as we indicated in Raines v. Byrd, 521 U.S. 811, 828, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), if Congress can sue the Executive for the erroneous application of the law that "injures" its power to legislate, surely the Executive can sue Congress for its erroneous adoption of an unconstitutional law that "injures" the Executive's power to administer-or perhaps for its protracted failure to act on one of his nominations. The opportunities for dragging the courts into disputes hitherto left for political resolution are endless.
Justice ALITO's dissent is correct that Raines did not formally decide this issue, but its reasoning does. The opinion spends three pages discussing famous, decades-long disputes between the President and Congress-regarding congressional power to forbid the Presidential removal of executive officers, regarding the legislative veto, regarding congressional appointment of executive officers, and regarding the pocket veto-that would surely have been promptly resolved by a Congress-vs.-the-President lawsuit if the impairment of a branch's powers alone conferred standing to commence litigation. But it does not, and never has; the "enormous power that the judiciary would acquire" from the ability to adjudicate such suits "would have made a mockery of [Hamilton's] quotation of Montesquieu to the effect that 'of the three powers above mentioned ... the JUDICIARY is next to nothing.' " Barnes v. Kline, 759 F.2d 21, 58 (C.A.D.C.1985) (Bork, J., dissenting) (quoting The Federalist No. 78 (A. Hamilton)).
To be sure, if Congress cannot invoke our authority in the way that JUSTICE ALITO proposes, then its only recourse is to confront the President directly. Unimaginable evil this is not. Our system is designed for confrontation. That is *791 what "[a]mbition ... counteract[ing] ambition," The Federalist, No. 51, at 322 (J. Madison), is all about. If majorities in both *2705 Houses of Congress care enough about the matter, they have available innumerable ways to compel executive action without a lawsuit-from refusing to confirm Presidential appointees to the elimination of funding. (Nothing says "enforce the Act" quite like "... or you will have money for little else.") But the condition is crucial; Congress must care enough to act against the President itself, not merely enough to instruct its lawyers to ask us to do so. Placing the Constitution's entirely anticipated political arm wrestling into permanent judicial receivership does not do the system a favor. And by the way, if the President loses the lawsuit but does not faithfully implement the Court's decree, just as he did not faithfully implement Congress's statute, what then? Only Congress can bring him to heel by ... what do you think? Yes: a direct confrontation with the President.
II
For the reasons above, I think that this Court has, and the Court of Appeals had, no power to decide this suit. We should vacate the decision below and remand to the Court of Appeals for the Second Circuit, with instructions to dismiss the appeal. Given that the majority has volunteered its view of the merits, however, I proceed to discuss that as well.
A
There are many remarkable things about the majority's merits holding. The first is how rootless and shifting its justifications are. For example, the opinion starts with seven full pages about the traditional power of States to define domestic relations-initially fooling many readers, I am sure, into thinking that this is a federalism opinion. But we are eventually told that "it is unnecessary to decide whether this federal intrusion on state power is a violation of the *792 Constitution," and that "[t]he State's power in defining the marital relation is of central relevance in this case quite apart from principles of federalism" because "the State's decision to give this class of persons the right to marry conferred upon them a dignity and status of immense import." Ante, at 2681. But no one questions the power of the States to define marriage (with the concomitant conferral of dignity and status), so what is the point of devoting seven pages to describing how long and well established that power is? Even after the opinion has formally disclaimed reliance upon principles of federalism, mentions of "the usual tradition of recognizing and accepting state definitions of marriage" continue. See, e.g., ante, at 2681. What to make of this? The opinion never explains. My guess is that the majority, while reluctant to suggest that defining the meaning of "marriage" in federal statutes is unsupported by any of the Federal Government's enumerated powers,[4] nonetheless needs some rhetorical basis to support its pretense that today's prohibition of laws excluding same-sex marriage is confined to the Federal Government (leaving the second, state-law shoe to be dropped later, maybe next Term). But I am only guessing.
Equally perplexing are the opinion's references to "the Constitution's guarantee of equality." Ibid . Near the end of the opinion, we are told that although the "equal protection guarantee of the Fourteenth Amendment makes [the] Fifth *2706 Amendment [due process] right all the more specific and all the better understood and preserved"-what can that mean?-"the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does." Ante, at 2695. The only possible interpretation of *793 this statement is that the Equal Protection Clause, even the Equal Protection Clause as incorporated in the Due Process Clause, is not the basis for today's holding. But the portion of the majority opinion that explains why DOMA is unconstitutional (Part IV) begins by citing Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), Department of Agriculture v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), and Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) -all of which are equal-protection cases.[5] and those three cases aRE the only authorities that the Court cites in Part IV about the Constitution's meaning, except for its citation of Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (not an equal-protection case) to support its passing assertion that the Constitution protects the " moral and sexual choices" of same-sex couples, ante, at 2694.
Moreover, if this is meant to be an equal-protection opinion, it is a confusing one. The opinion does not resolve and indeed does not even mention what had been the central question in this litigation: whether, under the Equal Protection Clause, laws restricting marriage to a man and a woman are reviewed for more than mere rationality. That is the issue that divided the parties and the court below, compare Brief for Respondent Bipartisan Legal Advisory Group of U.S. House of Representatives (merits) 24-28 (no), with Brief for Respondent Windsor (merits) 17-31 and Brief for United States (merits) 18-36 (yes); and compare 699 F.3d 169, 180-185 (C.A.2 2012) (yes), with id., at 208-211 (Straub, J., dissenting in part and concurring in part) (no). In accord with my previously expressed skepticism about the Court's "tiers of scrutiny" approach, I would review this classification only for its rationality. See United States v. Virginia, 518 U.S. 515, 567-570, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (SCALIA, J., dissenting). As nearly as I can tell, the Court agrees with that; its opinion *794 does not apply strict scrutiny, and its central propositions are taken from rational-basis cases like Moreno . But the Court certainly does not apply anything that resembles that deferential framework. See Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (a classification " 'must be upheld ... if there is any reasonably conceivable state of facts' " that could justify it).
The majority opinion need not get into the strict-vs.-rational-basis scrutiny question, and need not justify its holding under either, because it says that DOMA is unconstitutional as "a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution," ante, at 2695; that it violates "basic due process" principles, ante, at 2693; and that it inflicts an "injury and indignity" of a kind that denies "an essential part of the liberty protected by the Fifth Amendment," ante, at 2692. The majority never utters the dread words "substantive due process," perhaps sensing the disrepute into which that doctrine has fallen, but that is what those statements mean. Yet the opinion *2707 does not argue that same-sex marriage is "deeply rooted in this Nation's history and tradition," Washington v. Glucksberg, 521 U.S. 702, 720-721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), a claim that would of course be quite absurd. So would the further suggestion (also necessary, under our substantive-due-process precedents) that a world in which DOMA exists is one bereft of " 'ordered liberty.' " Id., at 721, 117 S.Ct. 2258 (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937) ).
Some might conclude that this loaf could have used a while longer in the oven. But that would be wrong; it is already overcooked. The most expert care in preparation cannot redeem a bad recipe. The sum of all the Court's nonspecific hand-waving is that this law is invalid (maybe on equal-protection grounds, maybe on substantive-due-process grounds, and perhaps with some amorphous federalism component playing a role) because it is motivated by a " 'bare ... desire to harm' " couples in same-sex marriages. Ante, at 2693. It is this proposition with which I will therefore engage.
*795 B
As I have observed before, the Constitution does not forbid the government to enforce traditional moral and sexual norms. See Lawrence v. Texas, 539 U.S. 558, 599, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (SCALIA, J., dissenting). I will not swell the U.S. Reports with restatements of that point. It is enough to say that the Constitution neither requires nor forbids our society to approve of same-sex marriage, much as it neither requires nor forbids us to approve of no-fault divorce, polygamy, or the consumption of alcohol.
However, even setting aside traditional moral disapproval of same-sex marriage (or indeed same-sex sex), there are many perfectly valid-indeed, downright boring-justifying rationales for this legislation. Their existence ought to be the end of this case. For they give the lie to the Court's conclusion that only those with hateful hearts could have voted "aye" on this Act. And more importantly, they serve to make the contents of the legislators' hearts quite irrelevant: "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." United States v. O'Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Or at least it was a familiar principle. By holding to the contrary, the majority has declared open season on any law that (in the opinion of the law's opponents and any panel of like-minded federal judges) can be characterized as mean-spirited.
The majority concludes that the only motive for this Act was the "bare ... desire to harm a politically unpopular group." Ante, at 2693. Bear in mind that the object of this condemnation is not the legislature of some once-Confederate Southern state (familiar objects of the Court's scorn, see, e.g., Edwards v. Aguillard, 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ), but our respected coordinate branches, the Congress and Presidency of the United States. Laying such a charge against them should require the most extraordinary *796 evidence, and I would have thought that every attempt would be made to indulge a more anodyne explanation for the statute. The majority does the opposite-affirmatively concealing from the reader the arguments that exist in justification. It makes only a passing mention of the "arguments put forward" by the Act's defenders, and does not even trouble to paraphrase or describe them. See ante, at 2693. I imagine that this is because it is harder to maintain the illusion *2708 of the Act's supporters as unhinged members of a wild-eyed lynch mob when one first describes their views as they see them.
To choose just one of these defenders' arguments, DOMA avoids difficult choice-of-law issues that will now arise absent a uniform federal definition of marriage. See, e.g., Baude, Beyond DOMA: Choice of State Law in Federal Statutes, 64 Stan. L.Rev. 1371 (2012). Imagine a pair of women who marry in Albany and then move to Alabama, which does not "recognize as valid any marriage of parties of the same sex." Ala.Code § 30-1-19(e) (2011). When the couple files their next federal tax return, may it be a joint one? Which State's law controls, for federal-law purposes: their State of celebration (which recognizes the marriage) or their State of domicile (which does not)? (Does the answer depend on whether they were just visiting in Albany?) Are these questions to be answered as a matter of federal common law, or perhaps by borrowing a State's choice-of-law rules? If so, which State's? And what about States where the status of an out-of-state same-sex marriage is an unsettled question under local law? See Godfrey v. Spano, 13 N.Y.3d 358, 892 N.Y.S.2d 272, 920 N.E.2d 328 (2009). DOMA avoided all of this uncertainty by specifying which marriages would be recognized for federal purposes. That is a classic purpose for a definitional provision.
Further, DOMA preserves the intended effects of prior legislation against then-unforeseen changes in circumstance. When Congress provided (for example) that a special estate-tax *797 exemption would exist for spouses, this exemption reached only opposite-sex spouses-those being the only sort that were recognized in any State at the time of DOMA's passage. When it became clear that changes in state law might one day alter that balance, DOMA's definitional section was enacted to ensure that state-level experimentation did not automatically alter the basic operation of federal law, unless and until Congress made the further judgment to do so on its own. That is not animus-just stabilizing prudence. Congress has hardly demonstrated itself unwilling to make such further, revising judgments upon due deliberation. See, e.g., Don't Ask, Don't Tell Repeal Act of 2010, 124 Stat. 3515.
The Court mentions none of this. Instead, it accuses the Congress that enacted this law and the President who signed it of something much worse than, for example, having acted in excess of enumerated federal powers-or even having drawn distinctions that prove to be irrational. Those legal errors may be made in good faith, errors though they are. But the majority says that the supporters of this Act acted with malice -with the "purpose" (ante, at 2695) "to disparage and to injure" same-sex couples. It says that the motivation for DOMA was to "demean," ibid .; to "impose inequality," ante, at 2694; to "impose ... a stigma," ante, at 2692; to deny people "equal dignity," ibid. ; to brand gay people as "unworthy," ante, at 2694; and to "humiliat [e ]" their children, ibid. (emphasis added).
I am sure these accusations are quite untrue. To be sure (as the majority points out), the legislation is called the Defense of Marriage Act. But to defend traditional marriage is not to condemn, demean, or humiliate those who would prefer other arrangements, any more than to defend the Constitution of the United States is to condemn, demean, or humiliate other constitutions. To hurl such accusations so casually demeans this institution . In the majority's judgment, any resistance to its holding is beyond the pale of *798 reasoned disagreement. To question its high-handed *2709 invalidation of a presumptively valid statute is to act (the majority is sure) with the purpose to "disparage," "injure," "degrade," "demean," and " humiliate" our fellow human beings, our fellow citizens, who are homosexual. All that, simply for supporting an Act that did no more than codify an aspect of marriage that had been unquestioned in our society for most of its existence-indeed, had been unquestioned in virtually all societies for virtually all of human history. It is one thing for a society to elect change; it is another for a court of law to impose change by adjudging those who oppose it hostes humani generis, enemies of the human race.
* * *
The penultimate sentence of the majority's opinion is a naked declaration that "[t]his opinion and its holding are confined" to those couples "joined in same-sex marriages made lawful by the State." Ante, at 2696, 2695. I have heard such "bald, unreasoned disclaimer[s]" before. Lawrence, 539 U.S., at 604, 123 S.Ct. 2472. When the Court declared a constitutional right to homosexual sodomy, we were assured that the case had nothing, nothing at all to do with "whether the government must give formal recognition to any relationship that homosexual persons seek to enter." Id., at 578, 123 S.Ct. 2472. Now we are told that DOMA is invalid because it "demeans the couple, whose moral and sexual choices the Constitution protects," ante, at 2694 -with an accompanying citation of Lawrence . It takes real cheek for today's majority to assure us, as it is going out the door, that a constitutional requirement to give formal recognition to same-sex marriage is not at issue here-when what has preceded that assurance is a lecture on how superior the majority's moral judgment in favor of same-sex marriage is to the Congress's hateful moral judgment against it. I promise you this: The only thing that will "confine" the Court's holding is its sense of what it can get away with.
*799 I do not mean to suggest disagreement with THE CHIEF JUSTICE's view, ante, pp. 2696 - 2697 (dissenting opinion), that lower federal courts and state courts can distinguish today's case when the issue before them is state denial of marital status to same-sex couples-or even that this Court could theoretically do so. Lord, an opinion with such scatter-shot rationales as this one (federalism noises among them) can be distinguished in many ways. And deserves to be. State and lower federal courts should take the Court at its word and distinguish away.
In my opinion, however, the view that this Court will take of state prohibition of same-sex marriage is indicated beyond mistaking by today's opinion. As I have said, the real rationale of today's opinion, whatever disappearing trail of its legalistic argle-bargle one chooses to follow, is that DOMA is motivated by " 'bare ... desire to harm' " couples in same-sex marriages. Supra, at 2691. How easy it is, indeed how inevitable, to reach the same conclusion with regard to state laws denying same-sex couples marital status. Consider how easy (inevitable) it is to make the following substitutions in a passage from today's opinion ante, at 2694:
"DOMA's This state law's principal effect is to identify a subset of state-sanctioned marriages constitutionally protected sexual relationships , see Lawrence , and make them unequal. The principal purpose is to impose inequality, not for other reasons like governmental efficiency. Responsibilities, as well as rights, enhance the dignity and integrity of the person. And DOMA this state law contrives to deprive some couples married under the laws of their State enjoying constitutionally protected *2710 sexual relationships, but not other couples, of both rights and responsibilities."
Or try this passage, from ante, at 2694:
"[DOMA] This state law tells those couples, and all the world, that their otherwise valid marriages relationships *800 are unworthy of federalstate recognition. This places same-sex couples in an unstable position of being in a second-tier marriage relationship . The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, see Lawrence, ...."
Or this, from ante, at 2694 -which does not even require alteration, except as to the invented number:
"And it humiliates tens ofthousands of children now being raised by same-sex couples. The law in question makes it even more difficult for the children to understand the integrity and closeness of their own family and its concord with other families in their community and in their daily lives."
Similarly transposable passages-deliberately transposable, I think-abound. In sum, that Court which finds it so horrific that Congress irrationally and hatefully robbed same-sex couples of the "personhood and dignity" which state legislatures conferred upon them, will of a certitude be similarly appalled by state legislatures' irrational and hateful failure to acknowledge that "personhood and dignity" in the first place. Ante, at 2696. As far as this Court is concerned, no one should be fooled; it is just a matter of listening and waiting for the other shoe.
By formally declaring anyone opposed to same-sex marriage an enemy of human decency, the majority arms well every challenger to a state law restricting marriage to its traditional definition. Henceforth those challengers will lead with this Court's declaration that there is "no legitimate purpose" served by such a law, and will claim that the traditional definition has "the purpose and effect to disparage and to injure" the "personhood and dignity" of same-sex couples, see ante, at 2695, 2696. The majority's limiting assurance will be meaningless in the face of language like that, as the majority well knows. That is why the language is there. The result will be a judicial distortion of our society's debate over *801 marriage-a debate that can seem in need of our clumsy "help" only to a member of this institution.
As to that debate: Few public controversies touch an institution so central to the lives of so many, and few inspire such attendant passion by good people on all sides. Few public controversies will ever demonstrate so vividly the beauty of what our Framers gave us, a gift the Court pawns today to buy its stolen moment in the spotlight: a system of government that permits us to rule ourselves . Since DOMA's passage, citizens on all sides of the question have seen victories and they have seen defeats. There have been plebiscites, legislation, persuasion, and loud voices-in other words, democracy. Victories in one place for some, see North Carolina Const., Amdt. 1 (providing that "[m]arriage between one man and one woman is the only domestic legal union that shall be valid or recognized in this State") (approved by a popular vote, 61% to 39% on May 8, 2012),[6] are offset by victories in other places for others, see Maryland Question 6 (establishing "that Maryland's civil marriage laws allow gay *2711 and lesbian couples to obtain a civil marriage license") (approved by a popular vote, 52% to 48%, on November 6, 2012).[7] Even in a single State , the question has come out differently on different occasions. Compare Maine Question 1 (permitting "the State of Maine to issue marriage licenses to same-sex couples") (approved by a popular vote, 53% to 47%, on November 6, 2012)[8] with Maine Question 1 (rejecting "the new law that lets same-sex couples marry") (approved by a popular vote, 53% to 47%, on November 3, 2009).[9] *802 In the majority's telling, this story is black-and-white: Hate your neighbor or come along with us. The truth is more complicated. It is hard to admit that one's political opponents are not monsters, especially in a struggle like this one, and the challenge in the end proves more than today's Court can handle. Too bad. A reminder that disagreement over something so fundamental as marriage can still be politically legitimate would have been a fit task for what in earlier times was called the judicial temperament. We might have covered ourselves with honor today, by promising all sides of this debate that it was theirs to settle and that we would respect their resolution. We might have let the People decide.
But that the majority will not do. Some will rejoice in today's decision, and some will despair at it; that is the nature of a controversy that matters so much to so many. But the Court has cheated both sides, robbing the winners of an honest victory, and the losers of the peace that comes from a fair defeat. We owed both of them better. I dissent.
Justice ALITO, with whom Justice THOMAS joins as to Parts II and III, dissenting.
Our Nation is engaged in a heated debate about same-sex marriage. That debate is, at bottom, about the nature of the institution of marriage. Respondent Edith Windsor, supported by the United States, asks this Court to intervene in that debate, and although she couches her argument in different terms, what she seeks is a holding that enshrines in the Constitution a particular understanding of marriage under which the sex of the partners makes no difference. The Constitution, however, does not dictate that choice. It leaves the choice to the people, acting through their elected representatives at both the federal and state levels. I would therefore hold that Congress did not violate Windsor's constitutional rights by enacting § 3 of the Defense of Marriage Act (DOMA), 110 Stat. 2419, which defines the meaning *803 of marriage under federal statutes that either confer upon married persons certain federal benefits or impose upon them certain federal obligations.
I
I turn first to the question of standing. In my view, the United States clearly is not a proper petitioner in this case. The United States does not ask us to overturn the judgment of the court below or to alter that judgment in any way. Quite to the contrary, the United States argues emphatically in favor of the correctness of that judgment. We have never before reviewed a decision at the sole behest of a party that took such a position, and to do *2712 so would be to render an advisory opinion, in violation of Article III's dictates. For the reasons given in Justice SCALIA's dissent, I do not find the Court's arguments to the contrary to be persuasive.
Whether the Bipartisan Legal Advisory Group of the House of Representatives (BLAG) has standing to petition is a much more difficult question. It is also a significantly closer question than whether the intervenors in Hollingsworth v. Perry,ante, --- U.S., at ----, 133 S.Ct. 1521 -which the Court also decides today-have standing to appeal. It is remarkable that the Court has simultaneously decided that the United States, which "receive[d] all that [it] ha[d] sought" below, Deposit Guaranty Nat. Bank v. Roper, 445 U.S. 326, 333, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), is a proper petitioner in this case but that the intervenors in Hollingsworth , who represent the party that lost in the lower court, are not. In my view, both the Hollingsworth intervenors and BLAG have standing.[1]
*804 A party invoking the Court's authority has a sufficient stake to permit it to appeal when it has " 'suffered an injury in fact' that is caused by 'the conduct complained of' and that 'will be redressed by a favorable decision.' " Camreta v. Greene, 563 U.S. ----, ----, 131 S.Ct. 2020, 2028, 179 L.Ed.2d 1118 (2011) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). In the present case, the House of Representatives, which has authorized BLAG to represent its interests in this matter,[2] suffered just such an injury.
In INS v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), the Court held that the two Houses of Congress were "proper parties" to file a petition in defense of the constitutionality of the one-house veto statute, id., at 930, n. 5, 103 S.Ct. 2764 (internal quotation marks omitted). Accordingly, the Court granted and decided petitions by both the Senate and the House, in addition to the Executive's petition. Id ., at 919, n. *, 103 S.Ct. 2764. That the two Houses had standing to petition is not surprising: The Court of Appeals' decision in Chadha, by holding the one-house veto to be unconstitutional, had limited Congress' power to legislate. In discussing Article III standing, the Court suggested that Congress suffered a similar injury whenever federal legislation it had passed was struck down, noting that it had "long held that Congress is the proper party to defend the validity of a statute when an agency of government, as a defendant charged with enforcing the statute, agrees with plaintiffs *805 that the statute *2713 is inapplicable or unconstitutional." Id ., at 940, 103 S.Ct. 2764.
The United States attempts to distinguish Chadha on the ground that it "involved an unusual statute that vested the House and the Senate themselves each with special procedural rights-namely, the right effectively to veto Executive action." Brief for United States (jurisdiction) 36. But that is a distinction without a difference: just as the Court of Appeals decision that the Chadha Court affirmed impaired Congress' power by striking down the one-house veto, so the Second Circuit's decision here impairs Congress' legislative power by striking down an Act of Congress. The United States has not explained why the fact that the impairment at issue in Chadha was "special" or "procedural" has any relevance to whether Congress suffered an injury. Indeed, because legislating is Congress' central function, any impairment of that function is a more grievous injury than the impairment of a procedural add-on.
The Court's decision in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), bolsters this conclusion. In Coleman, we held that a group of state senators had standing to challenge a lower court decision approving the procedures used to ratify an amendment to the Federal Constitution. We reasoned that the senators' votes-which would otherwise have carried the day-were nullified by that action. See id., at 438, 59 S.Ct. 972 ("Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes"); id ., at 446, 59 S.Ct. 972 ("[W]e find no departure from principle in recognizing in the instant case that at least the twenty senators whose votes, if their contention were sustained, would have been sufficient to defeat the resolution ratifying the proposed *806 constitutional amendment, have an interest in the controversy which, treated by the state court as a basis for entertaining and deciding the federal questions, is sufficient to give the Court jurisdiction to review that decision"). By striking down § 3 of DOMA as unconstitutional, the Second Circuit effectively "held for naught" an Act of Congress. Just as the state-senator-petitioners in Coleman were necessary parties to the amendment's ratification, the House of Representatives was a necessary party to DOMA's passage; indeed, the House's vote would have been sufficient to prevent DOMA's repeal if the Court had not chosen to execute that repeal judicially.
Both the United States and the Court-appointed amicus err in arguing that Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), is to the contrary. In that case, the Court held that Members of Congress who had voted "nay" to the Line Item Veto Act did not have standing to challenge that statute in federal court. Raines is inapposite for two reasons. First, Raines dealt with individual Members of Congress and specifically pointed to the individual Members' lack of institutional endorsement as a sign of their standing problem: "We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit." Id ., at 829, 117 S.Ct. 2312; see also ibid., n. 10 (citing cases to the effect that "members of collegial bodies do not have standing to perfect an appeal the body itself has declined to take" (internal quotation marks omitted)).
*2714 Second, the Members in Raines -unlike the state senators in Coleman -were not the pivotal figures whose votes would have caused the Act to fail absent some challenged action. Indeed, it is telling that Raines characterized Coleman as standing "for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the *807 ground that their votes have been completely nullified." 521 U.S., at 823, 117 S.Ct. 2312. Here, by contrast, passage by the House was needed for DOMA to become law. U.S. Const., Art. I, § 7 (bicameralism and presentment requirements for legislation).
I appreciate the argument that the Constitution confers on the President alone the authority to defend federal law in litigation, but in my view, as I have explained, that argument is contrary to the Court's holding in Chadha, and it is certainly contrary to the Chadha Court's endorsement of the principle that "Congress is the proper party to defend the validity of a statute" when the Executive refuses to do so on constitutional grounds. 462 U.S., at 940, 103 S.Ct. 2764. See also 2 U.S.C. § 288h(7) (Senate Legal Counsel shall defend the constitutionality of Acts of Congress when placed in issue).[3] Accordingly, in the narrow category of cases in which a court strikes down an Act of Congress and the Executive declines to defend the Act, Congress both has standing to defend the undefended statute and is a proper party to do so.
II
Windsor and the United States argue that § 3 of DOMA violates the equal protection principles that the Court has found in the Fifth Amendment's Due Process Clause. See Brief for Respondent Windsor (merits) 17-62; Brief for United States (merits) 16-54; cf. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). The Court rests its holding on related arguments. See ante, at 2694 - 2695.
Same-sex marriage presents a highly emotional and important question of public policy-but not a difficult question of constitutional law. The Constitution does not guarantee the right to enter into a same-sex marriage. Indeed, no provision of the Constitution speaks to the issue.
*808 The Court has sometimes found the Due Process Clauses to have a substantive component that guarantees liberties beyond the absence of physical restraint. And the Court's holding that "DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution," ante, at 2695, suggests that substantive due process may partially underlie the Court's decision today. But it is well established that any "substantive" component to the Due Process Clause protects only "those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' " Washington v. Glucksberg, 521 U.S. 702, 720-721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ; Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) (referring to fundamental rights as those that are so "rooted in the traditions and conscience of our people as to be ranked as fundamental"), as well as " 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' " Glucksberg, supra, at 721, 117 S.Ct. 2258 (quoting Palko v. Connecticut, *2715 302 U.S. 319, 325-326, 58 S.Ct. 149, 82 L.Ed. 288 (1937) ).
It is beyond dispute that the right to same-sex marriage is not deeply rooted in this Nation's history and tradition. In this country, no State permitted same-sex marriage until the Massachusetts Supreme Judicial Court held in 2003 that limiting marriage to opposite-sex couples violated the State Constitution. See Goodridge v. Department of Public Health, 440 Mass. 309, 798 N.E.2d 941. Nor is the right to same-sex marriage deeply rooted in the traditions of other nations. No country allowed same-sex couples to marry until the Netherlands did so in 2000.[4]
What Windsor and the United States seek, therefore, is not the protection of a deeply rooted right but the recognition of a very new right, and they seek this innovation not from a legislative body elected by the people, but from unelected *809 judges. Faced with such a request, judges have cause for both caution and humility.
The family is an ancient and universal human institution. Family structure reflects the characteristics of a civilization, and changes in family structure and in the popular understanding of marriage and the family can have profound effects. Past changes in the understanding of marriage-for example, the gradual ascendance of the idea that romantic love is a prerequisite to marriage-have had far-reaching consequences. But the process by which such consequences come about is complex, involving the interaction of numerous factors, and tends to occur over an extended period of time.
We can expect something similar to take place if same-sex marriage becomes widely accepted. The long-term consequences of this change are not now known and are unlikely to be ascertainable for some time to come.[5] There are those who think that allowing same-sex marriage will seriously undermine the institution of marriage. See, e.g., S. Girgis, R. Anderson, & R. George, What is Marriage? Man and Woman: A Defense 53-58 (2012); Finnis, Marriage: A Basic and Exigent Good, 91 The Monist 388, 398 (2008).[6] Others *810 think *2716 that recognition of same-sex marriage will fortify a now-shaky institution. See, e.g., A. Sullivan, Virtually Normal: An Argument About Homosexuality 202-203 (1996); J. Rauch, Gay Marriage: Why It Is Good for Gays, Good for Straights, and Good for America 94 (2004).
At present, no one-including social scientists, philosophers, and historians-can predict with any certainty what the long-term ramifications of widespread acceptance of same-sex marriage will be. And judges are certainly not equipped to make such an assessment. The Members of this Court have the authority and the responsibility to interpret and apply the Constitution. Thus, if the Constitution contained a provision guaranteeing the right to marry a person of the same sex, it would be our duty to enforce that right. But the Constitution simply does not speak to the issue of same-sex marriage. In our system of government, ultimate sovereignty rests with the people, and the people have the right to control their own destiny. Any change on a question so fundamental should be made by the people through their elected officials.
*811 III
Perhaps because they cannot show that same-sex marriage is a fundamental right under our Constitution, Windsor and the United States couch their arguments in equal protection terms. They argue that § 3 of DOMA discriminates on the basis of sexual orientation, that classifications based on sexual orientation should trigger a form of "heightened" scrutiny, and that § 3 cannot survive such scrutiny. They further maintain that the governmental interests that § 3 purports to serve are not sufficiently important and that it has not been adequately shown that § 3 serves those interests very well. The Court's holding, too, seems to rest on "the equal protection guarantee of the Fourteenth Amendment," ante, at 2695 -although the Court is careful not to adopt most of Windsor's and the United States' argument.
In my view, the approach that Windsor and the United States advocate is misguided. Our equal protection framework, upon which Windsor and the United States rely, is a judicial construct that provides a useful mechanism for analyzing a certain universe of equal protection cases. But that framework is ill suited for use in evaluating the constitutionality of laws based on the traditional understanding of marriage, which fundamentally turn on what marriage is.
Underlying our equal protection jurisprudence is the central notion that "[a] classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) (quoting F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920) ). The modern tiers of scrutiny-on which Windsor and the United States rely so heavily-are a heuristic to help judges determine when classifications have that "fair and substantial relation to the object of the legislation." Reed, supra, at 76, 92 S.Ct. 251.
*2717 *812 So, for example, those classifications subject to strict scrutiny-i.e., classifications that must be "narrowly tailored" to achieve a "compelling" government interest, Parents Involved in Community Schools v. Seattle School Dist. No. 1, 551 U.S. 701, 720, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (internal quotation marks omitted)-are those that are "so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ; cf. id ., at 452-453, 105 S.Ct. 3249 (Stevens, J., concurring) ("It would be utterly irrational to limit the franchise on the basis of height or weight; it is equally invalid to limit it on the basis of skin color. None of these attributes has any bearing at all on the citizen's willingness or ability to exercise that civil right").
In contrast, those characteristics subject to so-called intermediate scrutiny-i.e., those classifications that must be " 'substantially related' " to the achievement of "important governmental objective[s]," United States v. Virginia, 518 U.S. 515, 524, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ; id., at 567, 116 S.Ct. 2264 (SCALIA, J., dissenting)-are those that are sometimes relevant considerations to be taken into account by legislators, but "generally provid[e] no sensible ground for different treatment," Cleburne, supra, at 440, 105 S.Ct. 3249. For example, the Court has held that statutory rape laws that criminalize sexual intercourse with a woman under the age of 18 years, but place no similar liability on partners of underage men, are grounded in the very real distinction that "young men and young women are not similarly situated with respect to the problems and the risks of sexual intercourse." Michael M. v. Superior Court, Sonoma Cty., 450 U.S. 464, 471, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981) (plurality opinion). The plurality reasoned that "[o]nly women may become pregnant, and they suffer disproportionately the profound physical, emotional, and psychological consequences of sexual activity." Ibid. In other contexts, however, the Court has found that classifications based on gender are "arbitrary," Reed, supra, at 76, 92 S.Ct. 251, *813 and based on "outmoded notions of the relative capabilities of men and women," Cleburne,supra, at 441, 105 S.Ct. 3249, as when a State provides that a man must always be preferred to an equally qualified woman when both seek to administer the estate of a deceased party, see Reed, supra, at 76-77, 92 S.Ct. 251.
Finally, so-called rational-basis review applies to classifications based on "distinguishing characteristics relevant to interests the State has the authority to implement." Cleburne, supra, at 441, 105 S.Ct. 3249. We have long recognized that "the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantages to various groups or persons." Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). As a result, in rational-basis cases, where the court does not view the classification at issue as "inherently suspect," Adarand Constructors, Inc. v. Penã, 515 U.S. 200, 218, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (internal quotation marks omitted), "the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." Cleburne, supra, at 441-442, 105 S.Ct. 3249.
In asking the Court to determine that § 3 of DOMA is subject to and violates heightened scrutiny, Windsor and the *2718 United States thus ask us to rule that the presence of two members of the opposite sex is as rationally related to marriage as white skin is to voting or a Y-chromosome is to the ability to administer an estate. That is a striking request and one that unelected judges should pause before granting. Acceptance of the argument would cast all those who cling to traditional beliefs about the nature of marriage in the role of bigots or superstitious fools.
By asking the Court to strike down DOMA as not satisfying some form of heightened scrutiny, Windsor and the United States are really seeking to have the Court resolve a debate between two competing views of marriage.
*814 The first and older view, which I will call the "traditional" or " conjugal" view, sees marriage as an intrinsically opposite-sex institution. BLAG notes that virtually every culture, including many not influenced by the Abrahamic religions, has limited marriage to people of the opposite sex. Brief for Respondent BLAG (merits) 2 (citing Hernandez v. Robles, 7 N.Y.3d 338, 361, 821 N.Y.S.2d 770, 855 N.E.2d 1, 8 (2006) ("Until a few decades ago, it was an accepted truth for almost everyone who ever lived, in any society in which marriage existed, that there could be marriages only between participants of different sex")). And BLAG attempts to explain this phenomenon by arguing that the institution of marriage was created for the purpose of channeling heterosexual intercourse into a structure that supports child rearing. Brief for Respondent BLAG 44-46, 49. Others explain the basis for the institution in more philosophical terms. They argue that marriage is essentially the solemnizing of a comprehensive, exclusive, permanent union that is intrinsically ordered to producing new life, even if it does not always do so. See, e.g ., Girgis, Anderson, & George, What is Marriage? Man and Woman: A Defense, at 23-28. While modern cultural changes have weakened the link between marriage and procreation in the popular mind, there is no doubt that, throughout human history and across many cultures, marriage has been viewed as an exclusively opposite-sex institution and as one inextricably linked to procreation and biological kinship.
The other, newer view is what I will call the "consent-based" vision of marriage, a vision that primarily defines marriage as the solemnization of mutual commitment-marked by strong emotional attachment and sexual attraction-between two persons. At least as it applies to heterosexual couples, this view of marriage now plays a very prominent role in the popular understanding of the institution. Indeed, our popular culture is infused with this understanding of marriage. Proponents of same-sex marriage argue that because gender differentiation is not relevant to *815 this vision, the exclusion of same-sex couples from the institution of marriage is rank discrimination.
The Constitution does not codify either of these views of marriage (although I suspect it would have been hard at the time of the adoption of the Constitution or the Fifth Amendment to find Americans who did not take the traditional view for granted). The silence of the Constitution on this question should be enough to end the matter as far as the judiciary is concerned. Yet, Windsor and the United States implicitly ask us to endorse the consent-based view of marriage and to reject the traditional view, thereby arrogating to ourselves the power to decide a question that philosophers, historians, social scientists, and theologians are better qualified to explore.[7] Because our constitutional *2719 order *816 assigns the resolution of questions of this nature to the people, I would not presume to enshrine either vision of marriage in our constitutional jurisprudence.
Legislatures, however, have little choice but to decide between the two views. We have long made clear that neither the political branches of the Federal Government nor state governments are required to be neutral between competing visions of the good, provided that the vision of the good that they adopt is not countermanded by the Constitution. See, e.g., Rust v. Sullivan, 500 U.S. 173, 192, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("[T]he government 'may make a value judgment favoring childbirth over abortion' " (quoting Maher v. Roe, 432 U.S. 464, 474, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) )). Accordingly, both Congress and the States are entitled to enact laws recognizing either of the two understandings of marriage. And given the size of government and the degree to which it now regulates daily life, it seems unlikely that either Congress or the States could maintain complete neutrality even if they tried assiduously to do so.
Rather than fully embracing the arguments made by Windsor and the United States, the Court strikes down § 3 of DOMA as a classification not properly supported by its objectives. The Court reaches this conclusion in part because it believes that § 3 encroaches upon the States' sovereign prerogative to define marriage. See ante, at 2693 ("As the title and dynamics of the bill indicate, its purpose is to *817 discourage enactment of state same-sex marriage laws and to restrict the freedom and choice of couples married under those *2720 laws if they are enacted. The congressional goal was 'to put a thumb on the scales and influence a state's decision as to how to shape its own marriage laws' " (quoting Massachusetts v. United States Dept. of Health and Human Servs., 682 F.3d 1, 12-13 (C.A.1 2012) )). Indeed, the Court's ultimate conclusion is that DOMA falls afoul of the Fifth Amendment because it "singles out a class of persons deemed by a State entitled to recognition and protection to enhance their own liberty" and "imposes a disability on the class by refusing to acknowledge a status the State finds to be dignified and proper." Ante, at 2695 - 2696 (emphasis added).
To the extent that the Court takes the position that the question of same-sex marriage should be resolved primarily at the state level, I wholeheartedly agree. I hope that the Court will ultimately permit the people of each State to decide this question for themselves. Unless the Court is willing to allow this to occur, the whiffs of federalism in the today's opinion of the Court will soon be scattered to the wind.
In any event, § 3 of DOMA, in my view, does not encroach on the prerogatives of the States, assuming of course that the many federal statutes affected by DOMA have not already done so. Section 3 does not prevent any State from recognizing same-sex marriage or from extending to same-sex couples any right, privilege, benefit, or obligation stemming from state law. All that § 3 does is to define a class of persons to whom federal law extends certain special benefits and upon whom federal law imposes certain special burdens. In these provisions, Congress used marital status as a way of defining this class-in part, I assume, because it viewed marriage as a valuable institution to be fostered and in part because it viewed married couples as comprising a unique type of economic unit that merits special regulatory treatment. Assuming that Congress has the power under the *818 Constitution to enact the laws affected by § 3, Congress has the power to define the category of persons to whom those laws apply.
* * *
For these reasons, I would hold that § 3 of DOMA does not violate the Fifth Amendment. I respectfully dissent.

For an even more advanced scavenger hunt, one might search the annals of Anglo-American law for another "Motion to Dismiss" like the one the United States filed in District Court: It argued that the court should agree "with Plaintiff and the United States" and "not dismiss" the complaint. (Emphasis mine.) Then, having gotten exactly what it asked for, the United States promptly appealed.

There the Justice Department's refusal to defend the legislation was in accord with its longstanding (and entirely reasonable) practice of declining to defend legislation that in its view infringes upon Presidential powers. There is no justification for the Justice Department's abandoning the law in the present case. The majority opinion makes a point of scolding the President for his "failure to defend the constitutionality of an Act of Congress based on a constitutional theory not yet established in judicial decisions," ante, at 2688. But the rebuke is tongue-in-cheek, for the majority gladly gives the President what he wants. Contrary to all precedent, it decides this case (and even decides it the way the President wishes) despite his abandonment of the defense and the consequent absence of a case or controversy.

Justice ALITO attempts to limit his argument by claiming that Congress is injured (and can therefore appeal) when its statute is held unconstitutional without Presidential defense, but is not injured when its statute is held unconstitutional despite Presidential defense. I do not understand that line. The injury to Congress is the same whether the President has defended the statute or not. And if the injury is threatened, why should Congress not be able to participate in the suit from the beginning, just as the President can? And if having a statute declared unconstitutional (and therefore inoperative) by a court is an injury, why is it not an injury when a statute is declared unconstitutional by the President and rendered inoperative by his consequent failure to enforce it? Or when the President simply declines to enforce it without opining on its constitutionality? If it is the inoperativeness that constitutes the injury-the "impairment of [the legislative] function," as Justice ALITO puts it, post, at 2704 -it should make no difference which of the other two branches inflicts it, and whether the Constitution is the pretext. A principled and predictable system of jurisprudence cannot rest upon a shifting concept of injury, designed to support standing when we would like it. If this Court agreed with Justice ALITO's distinction, its opinion in Raines v. Byrd, 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), which involved an original suit by Members of Congress challenging an assertedly unconstitutional law, would have been written quite differently; and Justice ALITO's distinguishing of that case on grounds quite irrelevant to his theory of standing would have been unnecessary.

Such a suggestion would be impossible, given the Federal Government's long history of making pronouncements regarding marriage-for example, conditioning Utah's entry into the Union upon its prohibition of polygamy. See Act of July 16, 1894, ch. 138, § 3, 28 Stat. 108 ("The constitution [of Utah]" must provide "perfect toleration of religious sentiment," "Provided, That polygamous or plural marriages are forever prohibited").

Since the Equal Protection Clause technically applies only against the States, see U.S. Const., Amdt. 14, Bolling and Moreno, dealing with federal action, relied upon "the equal protection component of the Due Process Clause of the Fifth Amendment," Moreno, 413 U.S., at 533, 93 S.Ct. 2821.

North Carolina State Board of Elections, Official Results: Primary Election of May 8, 2012, Constitutional Amendment.

Maryland State Board of Elections, Official 2012 Presidential General Election Results for All State Questions, Question 06.

Maine Bureau of Elections, Nov. 3, 2009, Referendum Tabulation (Question 1).

Maine Bureau of Elections, Nov. 6, 2012, Referendum Election Tabulations (Question 1).

Our precedents make clear that, in order to support our jurisdiction, BLAG must demonstrate that it had Article III standing in its own right, quite apart from its status as an intervenor. See Diamond v. Charles, 476 U.S. 54, 68, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) ("Although intervenors are considered parties entitled, among other things, to seek review by this Court, an intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III" (citation omitted)); Arizonans for Official English v. Arizona, 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) ("Standing to defend on appeal in the place of an original defendant, no less than standing to sue, demands that the litigant possess a direct stake in the outcome" (internal quotation marks omitted)); id ., at 65, 117 S.Ct. 1055 ("An intervenor cannot step into the shoes of the original party unless the intervenor independently fulfills the requirements of Article III" (internal quotation marks omitted)).

H. Res. 5, 113th Cong., 1st Sess., § 4(a)(1)(B) (2013) ("[BLAG] continues to speak for, and articulates the institutional position of, the House in all litigation matters in which it appears, including in Windsor v. United States").

Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), is not to the contrary. The Court's statements there concerned enforcement, not defense.

Curry-Sumner, A Patchwork of Partnerships: Comparative Overview of Registration Schemes in Europe, in Legal Recognition of Same-Sex Partnerships 71, 72 (K. Boele-Woelki & A. Fuchs eds., rev. 2d ed., 2012).

As sociologists have documented, it sometimes takes decades to document the effects of social changes-like the sharp rise in divorce rates following the advent of no-fault divorce-on children and society. See generally J. Wallerstein, J. Lewis, & S. Blakeslee, The Unexpected Legacy of Divorce: The 25 Year Landmark Study (2000).

Among those holding that position, some deplore and some applaud this predicted development. Compare, e.g., Wardle, "Multiply and Replenish": Considering Same-Sex Marriage in Light of State Interests in Marital Procreation, 24 Harv. J.L. & Pub. Pol'y 771, 799 (2001) ( "Culturally, the legalization of same-sex marriage would send a message that would undermine the social boundaries relating to marriage and family relations. The confusion of social roles linked with marriage and parenting would be tremendous, and the message of 'anything goes' in the way of sexual behavior, procreation, and parenthood would wreak its greatest havoc among groups of vulnerable individuals who most need the encouragement of bright line laws and clear social mores concerning procreative responsibility") and Gallagher, (How) Will Gay Marriage Weaken Marriage as a Social Institution: A Reply to Andrew Koppelman, 2 U. St. Thomas L.J. 33, 58 (2005) ("If the idea of marriage really does matter-if society really does need a social institution that manages opposite-sex attractions in the interests of children and society-then taking an already weakened social institution, subjecting it to radical new redefinitions, and hoping that there are no consequences is probably neither a wise nor a compassionate idea"), with Brownworth, Something Borrowed, Something Blue: Is Marriage Right for Queers? in I Do/I Don't: Queers on Marriage 53, 58-59 (G. Wharton & I. Phillips eds. 2004) (Former President George W. "Bush is correct ... when he states that allowing same-sex couples to marry will weaken the institution of marriage. It most certainly will do so, and that will make marriage a far better concept than it previously has been") and Willis, Can Marriage Be Saved? A Forum, The Nation, p. 16 (2004) (celebrating the fact that "conferring the legitimacy of marriage on homosexual relations will introduce an implicit revolt against the institution into its very heart").

The degree to which this question is intractable to typical judicial processes of decisionmaking was highlighted by the trial in Hollingsworth v. Perry, 558 U.S. 183, 130 S.Ct. 705, 175 L.Ed.2d 657 (2010). In that case, the trial judge, after receiving testimony from some expert witnesses, purported to make "findings of fact" on such questions as why marriage came to be, Perry v. Schwarzenegger, 704 F.Supp.2d 921, 958 (N.D.Cal.2010) (finding of fact no. 27) ("Marriage between a man and a woman was traditionally organized based on presumptions of division of labor along gender lines. Men were seen as suited for certain types of work and women for others. Women were seen as suited to raise children and men were seen as suited to provide for the family"), what marriage is, id ., at 961 (finding of fact no. 34) ("Marriage is the state recognition and approval of a couple's choice to live with each other, to remain committed to one another and to form a household based on their own feelings about one another and to join in an economic partnership and support one another and any dependents"), and the effect legalizing same-sex marriage would have on opposite-sex marriage, id ., at 972 (finding of fact no. 55) ("Permitting same-sex couples to marry will not affect the number of opposite-sex couples who marry, divorce, cohabit, have children outside of marriage or otherwise affect the stability of opposite-sex marriages").
At times, the trial reached the heights of parody, as when the trial judge questioned his ability to take into account the views of great thinkers of the past because they were unavailable to testify in person in his courtroom. See 13 Tr. in No. C 09-2292 VRW (ND Cal.), pp. 3038-3039.
And, if this spectacle were not enough, some professors of constitutional law have argued that we are bound to accept the trial judge's findings-including those on major philosophical questions and predictions about the future-unless they are "clearly erroneous." See Brief for Constitutional Law and Civil Procedure Professors as Amici Curiae in Hollingsworth v. Perry, O.T. 2012, No. 12-144, pp. 2-3 ("[T]he district court's factual findings are compelling and should be given significant weight"); id ., at 25 ("Under any standard of review, this Court should credit and adopt the trial court's findings because they result from rigorous and exacting application of the Federal Rules of Evidence, and are supported by reliable research and by the unanimous consensus of mainstream social science experts"). Only an arrogant legal culture that has lost all appreciation of its own limitations could take such a suggestion seriously.